[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-13663
_____

D.C. Docket No. 1:09-cv-02664-SCJ

FRANKLIN OWUSU-ANSAH,

Plaintiff-Appellant,

versus

THE COCA-COLA COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(May 8, 2013)

Before TJOFLAT, CARNES, and JORDAN, Circuit Judges.

JORDAN, Circuit Judge:

On the recommendation of an independent psychologist, Coca-Cola placed

Franklin Owusu-Ansah, one of its employees, on paid leave and required him to

undergo a psychiatric/psychological fitness-for-duty evaluation.    After he was

cleared to return to work, Mr. Owusu-Ansah sued Coca-Cola, alleging that the evaluation violated 42 U.S.C. § 12112(d)(4)(A), a provision of the Americans with Disabilities Act.   The district court granted Coca-Cola's motion for summary judgment, concluding that the evaluation was both job-related and consistent with business necessity, and therefore permissible under the ADA.

Mr. Owusu-Ansah now appeals.   Following review of the record, and with the benefit of oral argument, we affirm.

## I

We exercise plenary review of the district court's grant of summary judgment on Mr. Owusu-Ansah's ADA claim.   *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007).   "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Brown v. Sec'y of State of Fla.*, 668 F.3d 1271, 1274 (11th Cir. 2012) (internal quotation marks omitted). *Accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

As noted above, we would normally look at all of the record evidence in the light most favorable to Mr. Owusu-Ansah.   But this is not a typical summary judgment case.   The magistrate judge issued a report recommending that summary judgment be entered in favor of Coca-Cola. In so doing, the magistrate judge laid

2

out the relevant facts, as he found them to exist, viewed through the prism of Rule 56. Mr. Owusu-Ansah asserts on appeal that the magistrate judge did not view the evidence in the light most favorable to him, improperly allowed hearsay evidence, and failed to consider certain evidence. Mr. Owusu-Ansah, however, did not file any objections to the magistrate judge's recitation of the evidence for Rule 56 purposes, and under our precedent, that failure to object means that we review the facts laid out by the magistrate judge only for plain error or manifest injustice. *See, e.g., LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988) ("Findings of fact made by a United States magistrate under the authority of 28 U.S.C. § 636, and which are accepted and adopted by the district court without objection by any party, may be reviewed on direct appeal only for plain error or manifest injustice.") (internal quotation marks omitted); *United States v. Hall*, 716 F.2d 826, 829 (11th Cir. 1983) (defendant who failed to object to magistrate judge's report and recommendation could "challenge the district court's findings of fact [taken from the report] only under a plain error standard").[1]

Mr. Owusu-Ansah has not even attempted to meet the exacting plain error/ manifest injustice standard, so we take the facts, for Rule 56 purposes, as set out in the magistrate judge's report and do not consider other evidence which might have,

---

[1] The Supreme Court has held that "a court of appeals may adopt a rule conditioning appeal, when taken from a district court judgment that adopts a magistrate's recommendation, upon filing of objections with the district court identifying those issues on which further review is desired." *Thomas v. Arn*, 474 U.S. 140, 155 (1985).

according to Mr. Owusu-Ansah, created issues of material fact. Nevertheless, we review de novo the magistrate judge's conclusions of law if they were accepted and adopted by the district court. *See Monroe v. Thigpen*, 932 F.2d 1437, 1440 (11th Cir. 1991).

## II

Mr. Owusu-Ansah began working for Coca-Cola in 1999 as a customer service representative at a call center in Dunwoody, Georgia. Coca-Cola promoted Mr. Owusu-Ansah three times, eventually elevating him to the position of quality assurance specialist in 2005. In that position, Mr. Owusu-Ansah – who monitored the performance of frontline call center associates – worked from home but was still required to report to the call center for certain meetings.

One such meeting occurred on December 14, 2007, when Mr. Owusu-Ansah met with his manager, Tanika Cabral, for a routine one-on-one. Prior to the meeting, Mr. Owusu-Ansah completed a questionnaire, the answers to which would then be discussed with Ms. Cabral. Under a section entitled "Barriers to success & proposed resolutions," Mr. Owusu-Ansah wrote "Candid discussion about work environment." He also wrote a similar response to a question which asked, "What steps have you taken to move closer to your career goals?"

During his meeting with Ms. Cabral, Mr. Owusu-Ansah articulated several incidents of alleged mistreatment by his managers and co-workers at Coca-Cola

4

over the course of his employment.  Mr. Owusu-Ansah said that from 2000 to 2009, certain managers and employees had discriminated against him or harassed him because he was from Ghana.  Prior to his meeting with Ms. Cabral, Mr. Owusu-Ansah had never complained to Coca-Cola about any such treatment.  Ms. Cabral observed that Mr. Owusu-Ansah became agitated during the meeting, banged his hand on the table where they sat, and said that someone was "going to pay for this."[2]

After the meeting, Ms. Cabral went to her own supervisor, Cassandra Cliette, and described Mr. Owusu-Ansah's conduct to her.  Ms. Cabral and Ms. Cliette then contacted Melissa Welsh, Coca-Cola's senior human resources manager.  Ms. Cabral explained to Ms. Welsh what had occurred during the meeting, including Mr. Owusu-Ansah banging his fist on the table and saying someone was "going to pay for this."  Upon hearing Ms. Cabral's account, Ms. Welsh became concerned "because it sounded as though a threat had been made against an employee, or employees of the company."

Ms. Welsh told Leslie Davis, one of Coca-Cola's security managers, about the situation and asked what should be done.  Ms. Davis, in turn, suggested they

---

[2] In his deposition, Mr. Owusu-Ansah described the meeting with Ms. Cabral as a "routine one-on-one," said that no one was upset, and denied banging his fist on the table or saying someone was "going to pay for this."

contact Dr. Marcus McElhaney, Ph.D., an independent consulting psychologist who specialized in crisis management and threat assessment.

On December 19, 2007, Ms. Welsh met with Mr. Owusu-Ansah and asked him to discuss in detail the concerns he had previously expressed to Ms. Cabral. Mr. Owusu-Ansah declined to do so.  Ms. Welsh then asked Mr. Owusu-Ansah if he would be willing to speak to a consultant Coca-Cola used to resolve workplace issues.  Mr. Owusu-Ansah agreed, and was introduced to Dr. McElhaney, who interviewed him right away at the Dunwoody call center.

In a private conversation with Dr. McElhaney, Mr. Owusu-Ansah discussed his concerns and described the alleged instances of discrimination.  After this meeting, Dr. McElhaney expressed concern to Coca-Cola over the emotional and psychological stability of Mr. Owusu-Ansah, noting that there was a "strong possibility that he was delusional."  Dr. McElhaney concluded that Mr. Owusu-Ansah was a "very stressed and agitated individual," and recommended that he be placed on paid leave to allow for further evaluation.  Coca-Cola followed Dr. McElhaney's recommendation and placed Mr. Owusu-Ansah on paid leave effective December 19, 2007.

Following this initial meeting, Dr. McElhaney continued his assessment of Mr. Owusu-Ansah by phone and email.  At Dr. McElhaney's suggestion, Mr. Owusu-Ansah agreed to visit a psychiatrist, Dr. Christopher Riddell, on January

6

14, 2008.  At this session, however, Mr. Owusu-Ansah declined to answer questions regarding his employment and workplace issues.  He also refused to sign a release allowing Dr. Riddell to discuss his impressions with Dr. McElhaney.  As a result, Dr. McElhaney was unable to complete his evaluation.

On January 22, 2008, Dr. McElhaney informed Ms. Welsh in writing that he remained "concern[ed] about Mr. Owusu-Ansah's apparent level of emotional distress and also about his ability to perceive events accurately."  Dr. McElhaney recommended that Mr. Owusu-Ansah undergo a psychiatric/psychological fitness-for-duty evaluation "to rule out the possibility of a mental condition that could interfere with his ability to successfully and safely carry out his job duties."

A week later, Ms. Welsh sent a letter to Mr. Owusu-Ansah informing him that, as a condition to his continued employment with Coca-Cola, he was to "complete an evaluation to identify whether there were any issues that could represent a risk to the safety of others in the workplace."  Failure to do so, explained Ms. Welsh, would subject Mr. Owusu-Ansah to immediate termination. Mr. Owusu-Ansah received the letter on February 1, 2008.

Mr. Owusu-Ansah returned for another session with Dr. Riddell – the evaluation complained of in this case – on February 20, 2008.  As part of the psychiatric evaluation, Dr. Riddell recommended that Mr. Owusu-Ansah undergo a personality test, the Minnesota Multiphasic Personality Inventory, before being

7

cleared for work.    When Mr. Owusu-Ansah failed to attend a scheduled appointment to take the MMPI, Coca-Cola sent a letter advising him that he was not in compliance with the conditions outlined in the prior correspondence.  Coca-Cola also informed Mr. Owusu-Ansah that he would be placed on unpaid leave on March 16, 2008, and warned him that continued noncompliance with the evaluation process would be considered a voluntary resignation.

Mr. Owusu-Ansah took the MMPI on March 20, 2008.   After reviewing the results of the MMPI, which indicated that Mr. Owusu-Ansah's profile was "within normal limits," Dr. McElhaney cleared Mr. Owusu-Ansah for return to work.  On April 22, 2008, Mr. Owusu-Ansah returned to work with Coca-Cola.

### III

The ADA, in § 12112(d)(4)(A), provides that

> [a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

Mr. Owusu-Ansah argues that, contrary to what the district court concluded, Coca-Cola violated § 12112(d)(4)(A) by requiring him to undergo the fitness-for-duty evaluation.  Coca-Cola, not surprisingly, disagrees.

### A

8

We have not yet ruled on whether an employee claiming protection under § 12112(d)(4)(A) of the ADA must prove that he is disabled. *See Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) (assuming, but not deciding, that § 12112(d)(4)(A) applies to non-disabled employees); *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002) (employee can sue under § 12112(d)(4)(A) if her employer perceived her as being disabled). Today we conclude, as have other circuits, that § 12112(d)(4)A) protects employees who are not disabled. *See Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 816 (6th Cir. 2012); *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007); *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2002); *Roe v. Cheyenne Mountain Conference Resort*, 124 F.3d 1221, 1229 (10th Cir. 1997).

Unlike other provisions of the ADA, § 12112(d)(4)(A) does not refer to a "qualified individual" – a person who "can perform the essential functions of the job" he or she holds or desires "with or without reasonable accommodation," 42 U.S.C. § 12111(8) – but rather to an "employee." We agree with the Tenth Circuit that "[i]t makes little sense to require an employee to demonstrate that he has a disability to prevent his employer from inquiring as to whether he has a disability." *Roe*, 124 F.3d at 1229. Our ruling, moreover, is consistent with our interpretation of 42 U.S.C. § 12112(d)(2) (prohibiting a medical examination to determine "whether [a job] applicant is an individual with a disability or as to the nature or

9

severity of such disability," except in limited situations), as not limiting coverage to those with disabilities.  *See Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1213 (11th Cir. 2010).

Nevertheless, as explained below, the evaluation conducted at the behest of Coca-Cola was both "job-related and consistent with business necessity." It was therefore valid under § 12112(d)(4)(A).

**B**

The phrase "job-related and consistent with business necessity" appears not only in § 12112(d)(4)(A) of the ADA, but in §§ 12112(b)(6), 12113(a), and 12113(c) as well.  We have said that "job-relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer" as a basis for an employment decision, while "[b]usiness necessity, in context, is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria" for such a decision.  *See Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1317 (11th Cir. 2009) (interpreting language in § 12113(a)) (internal quotation marks and alterations omitted).  Because "[a] term appearing in several places in a statutory text is generally read the same way each time it appears," *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994), we use the *Allmond* definitions here.

10

In *Watson* we held that in "any case where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity." 177 F.3d at 935. We explained that "the ADA does not, indeed cannot, require a police department to forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries." *Id.* Although Mr. Owusu-Ansah was not employed as a police officer engaged in dangerous work, *Watson* provides some guidance for us. *See also Williams*, 303 F.3d at 1290-91 (noting in dicta that an employer could have lawfully required medical examination for employee who was hostile, made threats, and was insubordinate). Given the information it had about Mr. Owusu-Ansah at the time, Coca-Cola did not violate § 12112(d)(4)(A) by requiring him to undergo a psychiatric/psychological fitness-for-duty evaluation. The evaluation, in our view, was "job-related and consistent with business necessity."

The evaluation was "job-related" because an "employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position." *Williams*, 303 F.3d at 1290. Ms. Cabral reported that Mr. Owusu-Ansah – in the course of complaining about discrimination and harassment – banged his fist on the table and said in a raised voice that someone was "going to pay for this." When he was deposed, Mr. Owusu-Ansah denied

11

having behaved that way during his meeting with Ms. Cabral, and he now points out that there were no prior incidents showing that he had a propensity for workplace violence. That, however, is not dispositive. Although Coca-Cola apparently never asked Mr. Owusu-Ansah for his version of what happened at the meeting, it did not rely solely on Ms. Cabral's account in ordering the evaluation. Coca-Cola knew that Mr. Owusu-Ansah had refused to speak to Ms. Welsh and Dr. Riddell about his workplace problems. In addition, Dr. McElhaney – the consulting psychologist – expressed "significant concerns" to Coca-Cola about Mr. Owusu-Ansah's emotional and psychological stability, and recommended a psychiatric/psychological fitness-for-duty evaluation.

On this record, we conclude that Coca-Cola had a reasonable, objective concern about Mr. Owusu-Ansah's mental state, which affected job performance and potentially threatened the safety of its other employees. Though Mr. Owusu-Ansah worked from home, he had access to and was required to attend meetings at the Dunwoody call center. *See*, *e.g.*, *Kroka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2000) ("We have stated that where inquiries into the psychiatric health of an employee are job related and reflect a concern with the safety of employees, the employer may . . . require that the employee undergo a physical examination designed to determine his ability to work."); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 812 (6th Cir. 1999) ("[W]e note that the district's obtaining advice

12

that further examination was needed to determine Sullivan's fitness to work buttresses the district's claim that it had reason to believe Sullivan could not perform some essential aspects of his job.").[3]

For basically the same reasons, the evaluation was also "consistent with business necessity." Though it may not be one of the traditional canons of statutory construction, common sense is not irrelevant in construing statutes,[4] and in our view an employer can lawfully require a psychiatric/psychological fitness-for-duty evaluation under § 12112(d)(4)(A) if it has information suggesting that an employee is unstable and may pose a danger to others. *See Conroy*, 333 F.3d at 97 ("[B]usiness necessities may include ensuring that the workplace is safe and secure."). *See also E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1283 (7th Cir. 1995) ("It would seem that a requirement that employees not pose a significant safety threat in the workplace would obviously be consistent with business necessity: a safe workplace is a paradigmatic necessity of operating a business."); *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1119 (11th Cir. 1993)

---

[3] This is not a case like *Sanders v. Illinois Dep't of Cent. Mgmt. Servs.*, No. 09-3207, 2012 WL 549325, at *12 (C.D. Ill. Feb. 21, 2012), where summary judgment was denied because the employer ordered a medical examination *after* an investigation concluded that the employee had *not* made any threats.

[4] "[T]here is no canon against using common sense in construing laws as saying what they obviously mean." *Roschen v. Ward*, 279 U.S. 337, 339 (1929) (Holmes, J.). *See also* John Paul Stevens, *The Shakespeare Canon of Statutory Construction*, 140 U. PA. L. REV. 1373, 1383 (1992) ("The fifth canon of statutory interpretation requires judges to use a little common sense.").

(holding that protecting employees from workplace hazards is a "business necessity" under Title VII).

## C

In challenging the district court's grant of summary judgment, Mr. Owusu-Ansah relies on enforcement guidance issued by the EEOC with respect to when § 12112(d)(4)(A) permits medical examinations.  This EEOC guidance, in relevant part, provides that a "medical examination of an employee may be 'job-related and consistent with business necessity' when an employer has a reasonable belief, based on objective evidence, that (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition."  EEOC, NOTICE NO. 915.002, ENFORCEMENT GUIDANCE: DISABILITY-RELATED INQUIRIES AND MEDICAL EXAMINATIONS OF EMPLOYEES UNDER THE AMERICANS WITH DISABILITIES ACT ¶ 5, 2000 WL 33407181 (2000).

An agency guidance document is entitled to respect only to the extent that it has the "power to persuade." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111 (2002).  To the extent that it says that objective evidence is needed, we find the EEOC enforcement guidance persuasive, s*ee Harrison*, 593 F.2d at 1213-14, but that does not mean reversal is in order.  As explained earlier, Coca-Cola had Ms. Cabral's account of Mr. Owusu-Ansah's conduct and statements at the

14

meeting; it knew that Mr. Owusu-Ansah had declined to discuss his workplace concerns with Ms. Welsh and Dr. Riddell; and it received the observations and recommendations of Dr. McElhaney, the consulting psychologist who had met with Mr. Owusu-Ansah. Coca-Cola therefore had sufficient objective evidence that Mr. Owusu-Ansah had a potentially dangerous mental condition.

Insofar as Mr. Owusu-Ansah contends that Coca-Cola also needed evidence that he was a "direct threat," a term defined by the ADA as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation," *see* 42 U.S.C. § 12111(3), we disagree. Significantly, ¶ 5 of the EEOC's enforcement guidance is worded disjunctively, so that a "direct threat" is required only if the employer does not have objective evidence that a medical condition will impair an employee's ability to perform an essential job function. Here, as we have explained, Coca-Cola had objective evidence – e.g., the concerns of Ms. Cabral and the observations and recommendations of Dr. McElhaney – that Mr. Owusu-Ansah was under emotional distress and was exhibiting signs of mental instability. And, as we have said before, "an employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position.

15

Absence of such skills prevents the employee from being 'otherwise qualified.'"

*Williams*, 303 F.3d at 1290-91 (citation omitted).[5]

## IV

The district court's grant of summary judgment in favor of Coca-Cola is affirmed.

**AFFIRMED.**

---

[5] The term "direct threat," though present in other provisions of the ADA (e.g., §§ 12113(b) and 12182(b)(3)) does not appear in § 12112(d)(4)(A).  One may therefore question whether the EEOC should have used that term in providing guidance about § 12112(d)(4)(A).  But given our analysis we need not and do not decide today whether the "direct threat" language in ¶ 5 of the EEOC's enforcement guidance is persuasive.  *Cf. Sullivan*, 197 F.3d at 812 ("There is no good reason to confine an employer's ability to determine the fitness of employees only to instances where they pose a direct threat.");  *Watson*, 177 F.3d at 935 ("[T]he ADA does not, indeed cannot, require a police department to forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries.").