David N. SNIDER, Plaintiff,

v.

UNITED STATES STEEL–FAIRFIELD WORKS MEDICAL DEPARTMENT, Defendant.

Case No. 2:12–CV–3508–AKK.

United States District Court,
N.D. Alabama,
Southern Division.

Signed June 10, 2014.

Kimberly R. Dodson, Law Offices of Kimberly R. Dodson LLC, Birmingham, AL, for Plaintiff.

William H. Morrow, Lightfoot Franklin & White LLC, Birmingham, AL, for Defendant.

### MEMORANDUM OPINION

ABDUL K. KALLON, District Judge.

David M. Snider filed this lawsuit against his employer United States Steel–Fairfield Works Medical Department ("U.S. Steel") alleging that U.S. Steel discriminated against him in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), when it placed Snider on medical leave in response

to an alleged threat Snider made against co-workers. Before the court is U.S. Steel's motion for summary judgment, which is briefed and ripe for resolution. Docs. 31, 33, 34, 38, 38. For the reasons stated below, the motion is due to be granted.

## I. SUMMARY JUDGMENT STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Id.* However, "mere conclusions and unsupported factual allegations are legally insuf-

ficient to defeat a summary judgment motion." *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir.2005) *(per curiam)* (citing *Bald Mountain Park, Ltd. v. Oliver,* 863 F.2d 1560, 1563 (11th Cir.1989)).

## II. FACTUAL BACKGROUND

U.S. Steel hired Snider as an electrical maintenance technician in 1988. Doc. 34–1 at 9. At the time relevant to this lawsuit, Snider worked in the hot finishing plant where he performed trouble shooting and other electrical jobs that "ma[d]e th[e] mill produce pipe." *Id.* at 9–10. This case arises out of U.S. Steel's response to events that occurred between Snider and employees in the "Bull Gang," who "work[ ] the whole plant" doing "little jobs" like working on cranes, and putting up signs and railroad signals. *Id.* at 12.

### A. The incident involving Snider and the Bull Gang

In April 2010, Snider discovered that the Bull Gang had removed the caution tape on a crane they repaired in the hot finishing plant. Doc. 34–1 at 11. Snider decided to challenge the decision because the crane purportedly appeared unstable and presented a safety hazard. *Id.* Consequently, the next day, Snider drove to the Bull Gang to confront Joel Moore and others about removing the caution tape. *Id.* at 13. Snider alleges that he entered the Bull Gang's office and asked in a loud (because he was wearing earplugs) but non-threatening tone why they removed the caution tape. *Id.* at 12, 13, 14. According to Snider, when Moore showed no regard for Snider's safety concerns and responded instead that the Bull Gang was "going to kick [Snider's] ass," Snider replied something to the effect that "it's a good day [for me] to die" or "I guess it's a good day [for me] to die." *Id.* at 16.

### B. U.S. Steel investigates and disqualifies Snider for work

U.S. Steel's investigation revealed that Snider confronted the Bull Gang members in an aggressive and angry tone, stated that "today is a good day for someone to die," and slammed the door when he exited the shop with enough force to shake the walls. Doc. 34–7 at 3. Further, U.S. Steel alleges that Snider also confronted the Bull Gang members in the bath house the following day. Id.; doc. 34–1 at 15. As a result, later in the week, Snider's area manager, a labor relations member, and Snider's Union grievance chairman met with Snider and questioned him about the exchange. Doc. 34–1 at 16; 34–7 at 3–4. Although Snider denied making the threats, doc. 34–1 at 17, nonetheless, based on concerns about Snider's conduct, U.S. Steel instructed Snider two days after the meeting to report to the plant's medical director Dr. Cheryl Szabo, id.; doc. 34–8 at 6. Dr. Szabo in turn conducted a fitness for duty examination and noted that Snider "did not understand why he was here," was initially "angry and confrontational," displayed sadness regarding his mother-in-law's illness, had "personality disorder with some component of paranoia and aggressiveness," and was "angry" upon learning that Dr. Szabo intended to refer him to the Employee Assistance Program ("EAP"). Doc. 34–10 at 19. Based on Dr. Szabo's evaluation, U.S. Steel temporarily disqualified Snider from work under medical code three[1] until he completed the EAP and anger management training. Doc. 34–7 at 4.

Allegedly, Snider chose to be non-compliant with the recommendation for EAP. For example, although Snider reported for his initial appointment, he did not receive an evaluation because he refused to sign the waiver and Health Insurance Portability and Accountability Act forms. Doc. 34–1 at 20, 21. Snider also refused treatment arranged by his Union representative with Licensed Practical Counselor Tony Martin at Grayson & Associates because Martin was not a psychiatrist. Doc. 34–1 at 21–22; see doc. 34–11 at 19. Ultimately, Snider withdrew from U.S. Steel's EAP and sought treatment instead through his own selected healthcare providers, beginning with Dr. Leesha Ellis–Cox at Alabama Psychiatric Services. Doc. 34–1 at 24.

Dr. Ellis–Cox informed U.S. Steel on May 24, 2010 that she evaluated Snider "secondary to an outburst on the job," opined that the initial evaluation and testing "provided no evidence of any pathology that would prohibit [ ] Snider returning safely to his duties," and released Snider "to return to work without restriction immediately." Doc. 34–5 at 23. After reviewing Dr. Ellis–Cox's report, Dr. Szabo contacted Dr. Ellis–Cox and learned that Snider had not informed Dr. Ellis–Cox of the incident with the Bull Gang. Doc. 34–8 at 9–10. As a result, Dr. Szabo faxed Dr. Ellis–Cox a portion of Snider's medical and employment records documenting the incident and other minor infractions. Doc. 34–8 at 9, 12–13; see id. at 11. Thereafter, because Dr. Szabo's evaluation "indicate[d] the possibility of paranoid, obsessive compulsive, and histrionic personality traits," Dr. Ellis–Cox referred Snider to therapy and anger management to "be assured that [ ] Snider can return to work fully functioning without concern for the safety and well being of everyone involved." Docs. 34–2 at 13; 34–5 at 24; 35–8 at 38.

[1] Medical three is a "physical rating" that "means [Snider was] temporarily disqualified from work." Doc. 34–8 at 23.

Initially, Dr. Ellis–Cox and Licensed Practical Counselor Wesley Wilkes at Alabama Psychiatric Services treated Snider through counseling sessions. Doc. 34–2 at 17–18; 34–8 at 18. However, after several sessions Snider refused any further treatment because he disagreed with their opinions. Doc. 34–2 at 17–18. Snider then enrolled in and completed a six-week anger management program with Impact Family Counseling. *Id.;* 38–2 at 29; 34–10 at 14.

In July 2010, Snider met with U.S. Steel and his Union representative to attempt to negotiate his return to work. Unfortunately, the meeting proved unsuccessful because Snider refused to sign a memorandum of understanding that described his conduct with the Bull Gang as "unacceptable" and as proof that he was "unfit for work," and required that he continue treatment with his healthcare providers. Doc. 34–6 at 1. Allegedly, the following month, Snider visited U.S. Steel's medical center to obtain copies of his medical records and exhibited "threatening behavior" that caused the receptionist to call security. Doc. 34–7 at 5. Snider denies that he was disruptive. Doc. 34–2 at 14.

The parties met next to discuss Snider's return in December. This meeting occurred after Dr. Ellis–Cox opined in October that continuing treatment had "little utility" because Snider was "minimally motivated to actively engage in the treatment process," and released Snider to return to work. Docs. 34–8 at 39–40; 34–10 at 21. Based on Dr. Ellis–Cox's opinion, Dr. Szabo informed Labor Relations that "medical was done." Doc. 34–8 at 20. Unfortunately, the December meeting proved unsuccessful. Doc. 34–7 at 5, 10–12. In January, however, the parties reached an agreement and U.S. Steel returned Snider to work, without restrictions, on the condition that he "be held solely responsible for his own personal conduct." Doc. 34–6 at 2. Dr. Szabo subsequently administered a return-to-work examination and removed the medical three rating. Doc. 34–8 at 23. Snider returned to the same position on February 6, 2011 at the same rate of pay. Doc. 34–1 at 10–11.

### C. Snider's Sickness and Accident Benefits

Snider maintains that U.S. Steel unjustifiably placed him on medical leave and forced him to apply for sickness and accident benefits in May 2010 based on a disability onset date of April 21, 2010. Docs. 34–2 at 12; 34–11 at 11. In addition to the application in May, Snider also submitted applications for sickness and accident benefits in August, September, and October 2010. Doc. 34–11 at 3, 5, 9. In November, U.S. Steel notified Snider that it would suspend Snider's benefits if he failed to "submit a continuation form reflecting updated medical treatment by December 4, 2010." Doc. 34–13 at 11. Snider ignored the notice and, as a result, U.S. Steel discontinued Snider's benefits on October 12, 2010 and denied Snider's January 2011 claim on timeliness grounds and lack of proper documentation. Doc. 34–10 at 29; 34–11 at 2. Collectively, Snider received $19,321.57 in sickness and accident benefits, doc. 34–13 at 3, which was significantly less than "his rate of pay ... [of] approximately $10,000 per month, including medical insurance and benefits," doc. 38–2 at 2.

### III. ANALYSIS

Snider contends that U.S. Steel discriminated against him by placing him on medical leave and requiring him to undergo treatment, refusing to timely return him to work, and forcing him to apply for sickness and accident benefits. Doc. 1. The purpose of the ADA is to "eliminat[e] ... discrimination against individuals with

disabilities." 42 U.S.C. § 12101(b)(1). " '[I]n this Circuit, the burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims.' " *Dulaney v. Miami–Dade Cnty.,* 481 Fed.Appx. 486, 489 (11th Cir.2012) (*quoting Holly v. Clairson Indus., LLC,* 492 F.3d 1247, 1255 (11th Cir.2007)). "Under this burden-shifting analysis, the plaintiff must first establish a *prima facie* case of discrimination under the ADA by showing (1) he is disabled, (2) he is a qualified individual, and (3) he was subjected to unlawful discrimination because of his disability." *Id.* (citing *Holly,* 492 F.3d at 1255–56).

U.S. Steel contends that Snider's *prima facie* case fails because Snider: 1) is not disabled, 2) was not qualified for the position during his medical leave, and 3) did not suffer an adverse employment action.[2] Alternatively, U.S. Steel asserts that it is due to prevail because it has non-discriminatory reasons for the actions at issue. The court will discuss U.S. Steel's contentions below.

A. *Snider did not have a disability because he had a "transitory and minor" impairment and was not a qualified individual with a disability*

■ The ADA defines disability as "(A) a physical or mental impairment that sub-

stantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment...." 42 U.S.C. § 12102(1). Although Snider applied for sickness and disability benefits, Snider maintains that he was not disabled and "should have never been put out of the plant" because his "private doctor never said that [he] had any psychological problems." Doc. 34–2 at 12. Therefore, by Snider's own contention, he did not have a disability and is instead claiming that U.S. Steel regarded him as disabled. To prove a "regarded as" disabled claim, Snider must "establish[ ] that he ... has been subjected to an action prohibited under ... [the ADA] because of an actual or perceived physical or mental impairment...."[3] 42 U.S.C. § 12102(3)(A). However, Snider cannot base a "regarded as" claim on "impairments that are transitory and minor." 42 U.S.C. § 12102(3)(B). An impairment is "transitory" if its "actual or expected duration [is] 6 months or less." *Id.*

■ Snider cannot establish his regarded as claim because his impairment lasted less than six months. Specifically, Dr. Ellis–Cox certified that it was "appropriate" for Snider to return to work on October 1, 2010, i.e. less than six months after U.S.

---

**2.** The court is not convinced by U.S. Steel's contention regarding the adverse employment action because U.S. Steel did not pay Snider his regular salary while on medical leave. *See Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1240 (11th Cir.2001) (adverse employment actions include "tangible consequence[s]" such as loss of pay). However, the court does not need to reach this issue because, as shown, *infra* in sections A. and B., Snider cannot establish the first two prongs of his *prima facie* case.

**3.** Until recently, the ADA required a plaintiff alleging a 'regarded as' claim to prove that

the perceived impairment "substantially limited a major life activity." 42 U.S.C. § 12102(2) (2008), *amended by* ADA Amendments Act (ADAAA) of 2008, Pub.L. No. 110–325, 2008 Stat. 3406 (2008) (codified as amended at 42 U.S.C. §§ 12101–12102). The ADAAA explicitly eliminated the substantial limitation requirement for 'regarded as' claims. *See* 42 U.S.C. § 12102(3)(A) (stating that an individual who is 'regarded as' disabled is considered disabled under the ADA, "whether or not the impairment limits or is perceived to limit a major life activity").

Steel disqualified Snider on April 16, 2010. Docs. 34–8 at 7; 34–10 at 24. In fact, Snider's sickness and accident benefits terminated on October 12, 2010 because Snider was no longer under the care of a healthcare professional and, consequently, could not submit the required documentation needed to establish that he was unable to work. Doc. 34–10 at 29. Although it took another three months to finalize Snider's return to work, there is nothing in the record to suggest that the delay was due to a continuing perceived disability. Therefore, the court finds that Snider's alleged impairment was "transitory and minor" and, as such, fails to qualify as a disability.

 Moreover, Snider was not a qualified individual with a disability because his threat to co-workers rendered him unfit for duty and prevented him from seeking the protection of the ADA. A "qualified individual" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions" of the job. 42 U.S.C. § 12111(8). "The [ADA] protects only 'qualified' employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one." *Palmer v. Cir. Ct. of Cook Cnty.,* 117 F.3d 351, 352 (7th Cir.1997) (citations omitted); *see also Williams v. Motorola, Inc.,* 303 F.3d 1284, 1290 (11th Cir.2002) ("An employee's ability to handle reasonably necessary stress and work reasonably well with others [is an] essential function[ ] of any position."); 42 U.S.C. § 12113(b). Snider attacks the assertion that he is not a qualified individual by contending that he never threatened his coworkers and that he simply confronted the Bull Gang members for safety reasons. Docs. 34–1 at 12–14; 34–2 at 12. While normally the court must view the facts in the light most favorable to the non-movant, the court does not have to reach the issue of whether Snider in fact made the alleged threats. Rather, the court must ascertain only whether U.S. Steel's investigation revealed that it had a "reasonable, objective concern about [Snider's] mental state, which affected job performance and potentially threatened the safety of its other employees." *Owusu– Ansah v. Coca–Cola Co.,* 715 F.3d 1306, 1312 (11th Cir.2013). Here, U.S. Steel had multiple reports from the Bull Gang members that contradicted Snider's account. As this Circuit has said previously, albeit in a sexual harassment context, even if the court assumes "that the complaining employees ... were lying through their teeth[,] [t]he inquiry ... is limited to whether [U.S. Steel] *believed* that [Snider] was guilty ..., and if so, whether this belief was the reason behind" the employment action. *Elrod v. Sears, Roebuck and Co.,* 939 F.2d 1466, 1470 (11th Cir.1991) (emphasis in original). U.S. Steel's decision to credit the reports of the Bull Gang employees is reasonable under the circumstances and, in fact, was bolstered by Dr. Szabo's opinion, which was subsequently reaffirmed by Dr. Ellis–Cox, that Snider required treatment and anger management before returning to duty. Therefore, on these facts, Snider has failed to establish that he was able "to handle reasonably necessary stress and work reasonably well with others...." *Williams,* 303 F.3d at 1290. Indeed, the representations Snider made on his sickness and accident benefit forms supports U.S. Steel's position on the qualification issue because Snider certified on each application he completed that he had an ongoing disability that made it "unknown" or "undetermined" when he would expect to return to work. Doc. 34–11 at 3–14. Significantly, Snider substantiated his claims with statements from his healthcare providers. *Id.* For all these reasons, the court finds that Snider failed

to show that he was a qualified individual with a disability.

In short, Snider has failed to establish a *prima facie* case because he cannot show that U.S. Steel regarded him as disabled or that he was qualified for the position at the time U.S. Steel placed him on medical leave. Therefore, U.S. Steel's motion for summary judgment is due to be granted.

B. *Snider points to no evidence from which a fact-finder could determine that he was discriminated against due to his alleged disability*

Alternatively, even if Snider can make a *prima facie* case, summary judgment is still warranted because U.S. Steel proffered a legitimate nondiscriminatory reason for its conduct, i.e. Snider's mental state, which Snider failed to rebut. Snider "must meet the reason head on and rebut it, and [ ] cannot succeed by simply quarreling with the wisdom of [U.S. Steel's proffered] reason." *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000) (citations omitted). Ultimately, because the evidence establishes that U.S. Steel acted reasonably in concluding after its investigation that Snider had threatened other employees, Snider cannot show pretext because the ADA does not require employers to retain or provide reasonable accommodation for "a potentially violent employee." *Palmer,* 117 F.3d at 352, 353 (the duty to provide a reasonable accommodation does not "run[ ] in favor of employees who commit or threaten to commit violent acts. The retention of such an employee would cause justifiable anxiety to coworkers and supervisors.") (citations omitted). Thus, under the circumstances here, rather than establishing discriminatory intent, U.S. Steel's decision to suggest that Snider apply for sickness and accident benefits and to mandate a fitness-for-duty examination and subsequent treatment es-

tablishes instead that U.S. Steel undertook the delicate balance a prudent employer must perform to address a threat in the workplace and to provide the necessary measures to protect employees and to return, if possible, the affected employee back to the workplace. *See Palmer,* 117 F.3d at 353 ("The retention of ... an employee [who has threatened violence] would cause justifiable anxiety to coworkers and supervisors. It would be unreasonable to demand of the employer either that it force its employees to put up with this or that it station guards to prevent the mentally disturbed employee from getting out of hand."); *Kelley v. Worley,* 29 F.Supp.2d 1304, 1313 (M.D.Ala.1998) ("Under the common law, an employer has a duty to supply the employee with a reasonably safe place to work.") (citation omitted). Indeed, once Snider's healthcare professionals qualified him for work and Snider reached an agreement with U.S. Steel, U.S. Steel returned Snider to the same position and rate of pay he previously held. While, ultimately, it took three months after Snider received medical clearance to return to work, Snider has failed to establish that discriminatory animus motivated the delay. In fact, the record is replete with negotiations between Snider's Union, Snider, and U.S. Steel for Snider's return to work that started well before Snider's October 2010 release to work and which ultimately led to an agreement for Snider to return to work. Therefore, the court cannot draw an inference of discriminatory animus, and, Snider's discrimination claim must fail.

## IV. CONCLUSION

U.S. Steel's motion for summary judgment is due to be granted in light of Snider's failure to establish a *prima facie* case or to rebut U.S. Steel's articulated reasons for placing him on medical leave.

The court will dismiss this case by separate order.

### ORDER

Consistent with the accompanying Memorandum Opinion, United States Steel–Fairfield Works Medical Department's motion for summary judgment is **GRANTED.** Doc. 31. This case is **DISMISSED** with prejudice. Costs taxed against Plaintiff David Snider.