[DO NOT PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 23-12692

————————————————

JENNIFER WILLIAMS,
an Individual,

Plaintiff-Appellant,

*versus*

ALABAMA STATE UNIVERSITY,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:22-cv-00048-ECM-KFP

————————————————

Before WILSON, BRASHER, and HULL, Circuit Judges.

PER CURIAM:

Plaintiff Jennifer Williams voluntarily resigned from her $135,000 position as the Athletic Director at Alabama State University to accept a position with another organization. After Williams's resignation, the University advertised and hired Dr. Jason Cable at a $170,000 salary, which was more than Williams's pay in the same job. Williams sued the University and its Board of Trustees (together, the "University"), alleging violations of the Equal Pay Act ("EPA"), the Clarke-Figures Equal Pay Act ("CFEPA"), and Title IX of the Education Amendments Act of 1972. Ultimately, the district court granted summary judgment in favor of the University, which Williams now appeals. After review and with the benefit of oral argument, we affirm.

## I.      BACKGROUND[1]

Williams has a master's degree in athletic administration and worked primarily in marketing and development before coming to the University. After completing her education, she served as the Assistant Director of Development in the Athletics Department at DePaul University from 2009 to 2012. Then, from 2012 to 2016,

---

[1] "[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]." *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). We accept these facts for summary-judgment purposes only. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Williams was the Associate Athletic Director for Development at North Carolina A&T State University.

In 2016, Williams began working at the University—a member of the Southwestern Athletic Conference ("SWAC"). She was initially recruited to come to the University as the Deputy Director of Intercollegiate Athletics, with a salary of $95,000. In that role, Williams was responsible for all day-to-day operations for the University's Division I programs, including 18 different sports, and for oversight, policy development, budget, and personnel management for various athletics programs. Williams was designated as the "Senior Woman Administrator." This designation was given to the highest-ranking female in the athletic department and carried no additional compensation.

From October 2017 through October 2018, Williams filled in as the University's Interim Athletic Director at a salary of $125,000. In that role, Williams managed and supervised the University's 18 sports programs, including 60 coaches, 20 staff, and more than 350 student athletes; administered a $15,000,000 budget; and brought in $1,500,000 in revenue. Williams continued as the designated Senior Woman Administrator.

In October 2018, Williams applied for, and was appointed as, the University's Athletic Director. The job posting listed the salary at $125,000 with the following minimum qualifications:

> Candidates should have a minimum of a master's degree, preferably in sports management or sports administration, or an MBA, and *at least five years of*

*experience in major leadership posts in sports administration and management.* The successful candidate must have thorough knowledge of NCAA rules and regulations and demonstrated experience in leadership, budgeting, and personnel management in athletics. He or she must also be able to demonstrate a commitment to diversity, including gender equity among student athletes, office personnel and coaching staff.

(Emphasis added). This $125,000 salary was the same salary earned by the two previous Athletic Directors, Melvin Hines and Stacy Danley, both of whom were male.

The University's president, Dr. Quinton T. Ross, Jr., delegated the selection process to Dr. Kevin A. Rolle, Chief of Staff at the University. Williams had only two years of experience (both at the University) in the direct management and administration of an athletics program—not the required five years. Nonetheless, Dr. Rolle determined that her previous years working in athletic marketing and development could be credited to satisfy the five-year minimum in the job posting.

Dr. Rolle offered Williams the Athletic Director position, and she accepted—but requested a $135,000 annual salary and incentives based on teams' performances. Dr. Ross approved the higher salary of $135,000 and the incentive awards, neither of which were previously given to a University athletic director. No previous male Athletic Director at the University had received more than $125,000.

One year into her tenure as Athletic Director, Williams requested a raise, explaining that she was the third-lowest-paid athletic director in the SWAC.  Although not receiving a raise, Williams did receive a $5,000 one-time re-signing bonus and an additional incentive award in 2019.

In May 2021, Williams announced her departure for a position at a different organization, and the University "issued a press release regarding her new position and threw her a going away party at the [University] Stadium."

Upon Williams's resignation, the University again posted a job listing to solicit candidates for the Athletic Director position. As before, Dr. Ross deputized Dr. Rolle to run the search.  They decided that, this time, they wanted "to hire a true executive for athletics, someone with more years of administrative experience and if possible someone with a doctoral level degree." Accordingly, the University posted different job requirements[2] with more years of leadership experience and with a "negotiable" salary:

> Candidates should have a minimum of a master's degree, preferably in sports management or sports administration, an MBA *or terminal degree* and *at least seven to ten years of experience in major leadership posts in sports administration and management*.  The successful candidate must have thorough knowledge of NCAA rules and regulations and demonstrated experience in

---

[2] The job description remained the same as it was when Williams was hired.

leadership, budgeting, and personnel management in athletics. He or she must also be able to demonstrate a commitment to diversity, including gender equity among student athletes, office personnel and coaching staff.

(Emphasis added).

Dr. Rolle selected Dr. Jason Cable as the top applicant, and the University hired him effective August 16, 2021. Dr. Cable has a master's degree in Secondary Education and a Ph.D. in Higher Education Administration.

Dr. Rolle determined that Dr. Cable had approximately 13 years of progressive management and leadership experience in athletic administration. Dr. Cable's relevant management and leadership experience included: one year as the Associate Athletic Director at Livingstone College; a little less than one year as Assistant Athletic Director for Compliance/Game Day Operations at Savannah State University; over two years as Senior Associate Athletic Director and one year as Assistant Director of Compliance at Jackson State University; and four years as Assistant Vice President for Athletic Compliance and Academic Services at Alcorn State University. Importantly to the University, Dr. Cable also had two years of experience as Senior Associate Commissioner for Administration at SWAC, the conference in which the University competes.

In contrast, Williams had just two years of athletic management and leadership experience—one year as the

University's Interim Athletic Director and one year as its Deputy Director. Williams's other experience primarily involved working with development and fundraising and external affairs. In addition, Dr. Cable's resume included another four years in lesser roles in college athletics.

Dr. Cable requested a starting salary of $170,000 with various incentives. To recruit and secure Dr. Cable, the University agreed to his salary request, given Dr. Cable's terminal degree and his many years of management and leadership experience in athletic administration roles. The University also agreed to certain performance-based incentives related to student-athlete academic achievements but denied Dr. Cable's request for additional incentives tied to fundraising benchmarks.

Even at a salary of $170,000, Dr. Cable was the third-lowest-paid athletic director in SWAC, just as Williams had been in the role. During his tenure at the University, Dr. Cable received one raise, as part of a University-wide six percent salary increase for all employees.

Williams then filed suit against the University, alleging that it violated the EPA, the CFEPA, and Title IX. Williams alleged that she (a woman) was paid less than Dr. Cable (a man) for performing substantially the same job. The disparity in wages, Williams alleged, was due to her sex, in violation of both the EPA and the CFEPA. Similarly, Williams alleged that the University's conduct violated Title IX because the terms, conditions, and benefits of Williams's employment were adversely affected based on her sex.

The University moved for summary judgment. The University presented evidence that its decision to pay $170,000 to Dr. Cable was based on factors other than sex—namely, Dr. Cable's extensive leadership and management experience in athletics administration and his education with a terminal degree— as permitted under the EPA and the CFEPA.

The district court granted summary judgment in the University's favor. This timely appeal followed.

## II.     STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). In doing so, "we view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014). Summary judgment is proper when the evidence, viewed in this light, "presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Id.* (quoting *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1307 (11th Cir. 2013)). We may affirm a grant of summary judgment "if there exists any adequate ground for doing so, regardless of whether it is the one on which the district court relied." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1117 (11th Cir. 1993).

## III.    DISCUSSION

### A.    The EPA—*Baker v. Upson Regional Medical Center*

The EPA prohibits wage discrimination on the basis of sex and "forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992); 29 U.S.C. § 206(d)(1). We analyze EPA claims under a two-step framework. *Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312, 1317 (11th Cir. 2024). First, the plaintiff must make her prima facie case by demonstrating "that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting § 206(d)(1)).

Once the plaintiff establishes her prima facie case, the burden shifts to the employer to prove that the difference in pay is justified by one of the EPA's four exceptions: (1) "a seniority system"; (2) "a merit system"; (3) "a system which measures earnings by quantity or quality of production"; or (4) "a differential based on any factor other than sex." *Baker*, 94 F.4th at 1317 (quoting *Brock v. Ga. Sw. Coll.*, 765 F.2d 1026, 1036 (11th Cir. 1985)); *see also* § 206(d)(1). These exceptions are affirmative defenses for which the defendant bears the burden of proof. *Corning Glass Works*, 417 U.S. at 196-97; *Gosa v. Bryce Hosp.*, 780 F.2d 917, 918 (11th Cir. 1986).

## B.    The CFEPA

Like the EPA, the CFEPA prohibits employers in Alabama from "pay[ing] any of its employees at wage rates less than the rates paid to employees of another sex or race for equal work," unless the difference in wages is based on a seniority system, a merit system, a system that measures earnings by quantity or quality, or "a differential based on any factor other than sex or race." Ala. Code § 25-1-30(b). Although neither this Court nor Alabama's highest court has yet opined on the CFEPA, the statutes are materially identical as they relate to gender-based pay disparity. The EPA provides:

> No employer having employees subject to any provisions of this section shall discriminate . . . between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to[:]
>
>> (i) a seniority system;
>> (ii) a merit system;
>> (iii) a system which measures earnings by quantity or quality of production; or

>(iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1). Similarly, the CFEPA provides:

> An employer, including the state or any of its political subdivisions, including public bodies, may not pay any of its employees at wage rates less than the rates paid to employees of another sex or race for equal work within the same establishment on jobs the performance of which requires equal skill, effort, education, experience, and responsibility, and performance under similar working conditions, except where the payment is made pursuant to any of the following:
>
>> (1) A seniority system.
>> (2) A merit system.
>> (3) A system that measures earnings by quantity or quality of production.
>> (4) A differential based on any factor other than sex or race.

Ala. Code § 25-1-30(b).

We therefore conclude—in the absence of any guidance from Alabama's state courts, which would otherwise control—that it is appropriate to analyze a CFEPA claim similarly to an EPA

claim.[3]    And, as we described above, that analysis comprises a two-step framework under which the plaintiff first demonstrates a prima facie case and the defendant then bears the burden of proving an affirmative defense. *See Baker*, 94 F.4th at 1317.

## C.    Williams's Prima Facie Case

To establish a prima facie case under the EPA and the CFEPA, a plaintiff must show that an employer pays different wages to people of opposite sexes for equal work. *Corning Glass Works*, 417 U.S. at 195. Williams has met that bar here by showing that Dr. Cable, a man, was paid more money to perform the same job that Williams, a woman, had just vacated. Though the University "does not concede" that Williams established a prima facie case for her EPA and CFEPA claims, it also has not disputed as much either—here or before the district court.

Concluding that Williams has made a prima facie showing, we proceed to the University's affirmative defense.

## D.    The University's Affirmative Defense

Once the plaintiff establishes her prima facie case, the burden shifts to the employer to prove that the difference in pay is justified by one of the EPA's four exceptions. *Baker*, 94 F.4th at 1317; *see also* § 206(d)(1); Ala. Code § 25-1-30(b). The application of any of these exceptions is an affirmative defense for which the defendant bears the burden of proof. *Corning Glass Works*, 417 U.S.

---

[3] The parties appear to agree that this is the correct approach.

at 196-97.    The University invokes the fourth of the EPA's affirmative defenses—any factor other than sex.

Here, Dr. Rolle's unrebutted affidavit establishes that, in selecting Dr. Cable as the top applicant for the Athletic Director position, the University considered his Ph.D. in Higher Education Administration and his over 13 years of progressive management and leadership experience in athletic administration as well as his service as the Senior Associate Commissioner of the SWAC, in which ASU's athletic teams compete.  Dr. Cable had well over ten years in leadership roles in athletic administration: he previously worked as an Associate Athletic Director (1 year), an Assistant Athletic Director for Compliance (2 years), a Senior Associate Athletic Director (2 years), an assistant to an Athletic Director (2 years), an Assistant Vice President for Athletic Compliance (4 years), and as Senior Associate Commissioner of the SWAC (2 years).

The "factor other than sex" exception applies when a pay disparity "results from unique characteristics of the same job; from an individual's experience, training, or ability; or from special exigent circumstances connected with the business." *Glenn v. Gen. Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988); *Miranda*, 975 F.2d at 1533 n.18 ("Factors such as experience and education operate as a defense to liability rather than as part of a plaintiff's *prima facie* case under the Act.").  Even subjective "business reasons" may be sufficient so long as they are susceptible to some objective evaluation.  *See Irby v. Bittick*, 44 F.3d 949, 955-56 (11th Cir. 1995);

*Fowler v. Blue Bell, Inc.*, 737 F.2d 1007, 1011 (11th Cir. 1984) (noting, in a Title VII case, that "[t]he reason that the defendant offers in this case, although somewhat subjective, is not so incapable of objective evaluation as to render it inadequate to meet the defendant's burden of rebuttal").

Dr. Rolle also attested that, when Dr. Cable asked for $170,000 as his salary, "[t]he salary was accepted given his terminal degree and his years of experience and serving in specific athletic administrative roles." These qualifications aligned with the University's stated goal of hiring "a true executive for athletics, someone with more years of administrative experience and if possible someone with a doctoral level degree." Moreover, the University's goals were reflected in the heightened job requirements and preferences that were added to the job posting immediately after Williams resigned and before Dr. Cable applied.

Under our caselaw, the University's affirmative defense is sufficient. Dr. Cable's higher education levels and many years of leadership posts and management experience are legitimate business reasons to justify a higher salary. *See, e.g., Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1205 (11th Cir. 2013) (holding, in a failure-to-promote context, that it was "objectively reasonable" for an employer to promote a male employee who had auditing experience over a female employee who did not, even though the female employee had more managerial experience, a broad accounting background, and stronger educational credentials); *Schwartz v. Fla. Bd. of Regents*, 954 F.2d 620, 623 (11th Cir. 1991)

(holding that "outstanding service to the university, administrative duties, publications, research, supervision of doctoral students, and performance" were factors "not based on sex and . . . sufficient to sustain an employer's burden to show that the salary disparity does not result from sex discrimination").

We recognize that Williams argues that the job did not require a doctoral degree and that Dr. Cable's Ph.D. was not in an athletics-related field. She is right, of course, that the job did not require a terminal degree. Rather, it presented a terminal degree as one of three ways to satisfy the educational requirement: (1) "a master's degree, preferably in sports management or sports administration," (2) "an MBA," or (3) "[a] terminal degree." Nonetheless, there is no dispute that Dr. Cable had a terminal degree, and the job posting does not specify what field in which that terminal degree should be. That Dr. Cable had a terminal degree, among other things, was a legitimate "factor other than sex." *See* 29 U.S.C. § 206(d)(1).

Second, Williams argues that most of Dr. Cable's work experience, including his job at SWAC, was not related to the Athletic Director job. We disagree. As outlined above, Dr. Cable had over ten years of leadership experience in athletic management and administration at several universities and organizations. Williams, on the other hand, had only two years of relevant experience. She had worked for one year as a Deputy Athletic Director and one year as an Interim Athletic Director, but her previous seven years of experience were in development and

marketing, mainly involving fundraising and external affairs. Williams acknowledged that these development positions, in which she was "working directly with money" and "overseeing external [affairs]," did not provide her with the skill sets she would need to be an Athletic Director.

Notably too, in addition to Dr. Cable having more years of relevant experience than Williams, his particular experience as the second-in-command of the administration of SWAC—the conference in which the University is a member, consisting of a dozen member institutions and 18 sports competing at the Division I level—was another legitimate factor other than sex supporting the decision to pay Dr. Cable his requested salary. This is especially true given Dr. Cable's experience overseeing compliance programs and services while at the SWAC. This is not a case where two employees worked the same job contemporaneously, but one where the University met the salary demands of a more experienced leader for the job in order to secure him.

In sum, we hold that the University carried its burden by presenting evidence of objective and legitimate factors other than sex for the pay differential. Accordingly, we conclude that the University was entitled to summary judgment on Williams's EPA and CFEPA claims.[4]

---

[4] We are not persuaded by the dissent's reliance on a few comments in Williams's deposition (cited in her appellate brief) about her midriff by a Board of Trustees member and vague comments about her body by Dr. Rolle that

### E.    Williams's Title IX Claim

After appellate briefing concluded in this appeal, this Court decided in *Joseph v. Board of Regents of the University System of Georgia* that Title IX "does not provide an implied right of action for sex discrimination in employment." 121 F.4th 855, 860, 867 (11th Cir. 2024) (explaining that although Title IX provides an implied right of action for students who complain of sex discrimination by schools that receive federal funds, the Supreme Court had "never extended the implied private right of action under Title IX to claims of sex discrimination for employees of educational institutions.").

In her supplemental brief addressing *Joseph*'s impact on her Title IX claim, Williams urges us not to apply *Joseph* because, she

---

Williams even admits: "I wouldn't say verbatim." Interestingly, in her opposition to summary judgment in the district court, Williams's brief did not mention these comments, as was her burden to do as the non-moving party. *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring a party asserting a genuine dispute of material fact to "cit[e] to particular parts of materials in the record, including depositions . . . .").

In any event, some of these alleged comments occurred even before Williams became the Interim Athletic Director and had no apparent connection to her selection and pay as the Athletic Director. In addition, Williams does not attribute the "shapely" comment, cited by the dissent, to Dr. Rolle. Moreover Dr. Rolle's alleged statement that she "should be happy making the money that [she was] making" as Athletic Director must be read in context of the record. As Dr. Rolle attested, Williams lacked experience, such that the University had to agree to liberally credit *three years* of her arguably non-qualifying experience in order to hire her for the Athletic Director position in the first place. The alleged observation that Williams should be happy is not surprising or gender-based in the context of this particular case.

contends, it was wrongly decided.  This we cannot do.  Under our prior-panel-precedent rule, we are bound to apply *Joseph*, and thus we affirm the grant of summary judgment to the University on Williams's Title IX claim.  *See United States v. Sneed*, 600 F.3d 1326, 1332 (11th Cir. 2010) ("[A] prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*."); *see also Smith v. GTE Corp.*, 236 F.3d 1292, 1302-03 (11th Cir. 2001) (rejecting an "overlooked reason" exception to the prior precedent rule).

## IV.    CONCLUSION

For these reasons, we affirm the district court's order granting summary judgment in favor of the University on all Williams's claims.

**AFFIRMED.**

23-12692                WILSON, J., Dissenting                1

WILSON, Circuit Judge, dissenting:

The majority finds that Alabama State University and its Board of Trustees (collectively, the University) met their burden under the Equal Pay Act (EPA) and the Clarke-Figures Equal Pay Act (CFEPA) to show that their decision to pay the current Athletic Director, Dr. Jason Cable, substantially more than the former Athletic Director, Jennifer Williams, was based on any factor "other than sex." But the majority dismisses evidence of derogatory, sex-based remarks made to Williams by male colleagues. These remarks make it impossible to conclude at the summary judgment stage that sex "provided *no basis* for the wage differential." *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th Cir. 1994). Because Williams should have had the chance to present this evidence to a jury, I respectfully dissent.

It is the jury's role to weigh evidence, not ours. "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). For the University's part, it presented an affidavit from its Chief of Staff, Dr. Kevin A. Rolle, that it sought to fill the vacancy from Williams' departure with a "true executive for athletics." To the University, this apparently meant someone with "more years of administrative experience and if possible someone with a doctoral level degree." When Dr. Cable requested a $170,000 salary, the University readily agreed. To justify the $35,000 pay increase from

Williams' role, the University credited Dr. Cable's years of experience and doctorate in higher education administration.

But Williams testified at her deposition about comments by University leadership about her body, such as Dr. Rolle remarking that she was "shapely" and a Board of Trustees member suggesting that she should wear clothing exposing her "midriff" to increase donations to the University. Williams also described a situation where she presented information to Dr. Rolle about gendered pay imbalances for female athletic directors and asked for a raise. Dr. Rolle responded that she "should be happy" making the money she was making. Williams took this to mean that she should be happy with her pay because she is a woman.

To meet its burden for an EPA affirmative defense, "the employer must show that none of the decision-makers . . . were influenced by gender bias." *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1078 (11th Cir. 2003). Based on these comments, I would not so quickly conclude that no decisionmakers were influenced by gender bias. Two of these instances involved Dr. Rolle, the decisionmaker tasked with hiring and negotiating the salary for the athletic director position and who Williams approached for a raise. A gendered comment—by a decisionmaker, during a conversation about pay, and in a case about an employer's motivations in setting pay—can be direct evidence of discrimination. *See Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1301 (11th Cir. 2023) (per curiam). And evidence of sex discrimination or bias would allow a

23-12692                    WILSON, J., Dissenting                    3

reasonable jury to conclude that Williams' sex contributed to the $35,000 differential between her pay and Dr. Cable's.

This court should have let a jury decide whether the University paid Williams less for the same job because she is a woman or whether the difference stemmed solely from Dr. Cable's education and experience. A jury might have rightly found either way, but that was their call to make. I respectfully dissent.