**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 22-12354

————————————

AILEEN MULLIN,

*Plaintiff-Appellant,*

*versus*

SECRETARY, U.S. DEPARTMENT OF VETERANS AFFAIRS,

*Defendant-Appellee.*

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cv-02697-VMC-AEP

————————————

Before JORDAN, LAGOA, and TJOFLAT, Circuit Judges.

PER CURIAM:

The Petition for Panel Rehearing is DENIED. However, to correct a factual error, we VACATE and withdraw our previous opinion dated August 8, 2025, 149 F.4th 1244 (11th Cir. 2025), and substitute the following opinion.

Aileen Mullin sued the Department of Veterans Affairs, asserting many claims under the Rehabilitation Act of 1973, 29 U.S.C. § 794. The claims were for disability discrimination, failure to accommodate, unlawful disclosure, and retaliation (and/or a retaliatory hostile work environment). The district court granted summary judgment for the Department on all the claims, and Ms. Mullin now appeals.

Following a review of the record, and with the benefit of oral argument, we reverse and remand on the unlawful disclosure claim and affirm on the other claims.[1]

## I. BACKGROUND

In reviewing the district court's summary judgment order, we view the facts in the light most favorable to Ms. Mullin. *See Taxinet Corp. v. Leon*, 114 F.4th 1212, 1231 (11th Cir. 2024). Seen through that lens, the record reflects the following.[2]

## A.

Ms. Mullin began her employment with the Department of Veterans Affairs in February 2009. She remains employed by the Department as a Ratings Veterans Service Representative at the St. Petersburg Regional Office of the Veterans Benefits Administration.

---

[1] As to any issues not discussed in this opinion, we summarily affirm.

[2] We include a fair number of dates in setting out the chronology of events because the dates in this case matter.

In July 2010, Ms. Mullin began to experience respiratory issues at work. Believing that the building she worked in was causing the respiratory problems, she spoke with someone at the Department that month about what could be done to address what she believed to be issues with the building. According to Ms. Mullin, the Department did not do anything after she first raised her concerns, and she was told to file a claim for worker's compensation.

Ms. Mullin's respiratory issues worsened over time. In December 2011 she informed the Department that she was still having trouble with her breathing and asthma. She asked for an alternative work schedule to limit the time she spent in the building. She also sought relocation of her workstation to a different place in the building.

The Department granted both requests. It limited the number of days Ms. Mullin was required to be in the office and it changed her workstation. Although she had requested these accommodations, Ms. Mullin did not consider them effective because she continued to suffer from respiratory issues.

In January 2012, Ms. Mullin informed the Department that her respiratory issues were continuing and remained severe. That same month, she met with human resources specialist Tammi Clarke and a union representative to discuss her ongoing health issues. Ms. Mullin does not remember whether she made any accommodation requests at this meeting, but she recalls that Ms.

Clarke told her that her workstation would be moved from the second floor to the third floor.

Ms. Mullin returned to work two days after this meeting and found that she had not been assigned a new workstation, which shocked and terrified her. She suffered an asthma attack that day and went to the hospital. The next time she returned to work, her workstation had been moved to the third floor.

On January 31, 2012, Ms. Mullin emailed the human resources department asking that an air purifier Ms. Clarke previously proposed placing in her office on the third floor be put there without delay. The air purifier was placed in her office two days later. Ms. Mullin informed the Department that she did not believe the air purifier would be effective because, based on her research, it was designed for smaller spaces. She also noted that she would "have it running full force and [her] fingers [were] crossed."

**B.**

In March 2012, Ms. Mullin was diagnosed with breast cancer. Her oncologist noted in a Family and Medical Leave Act (FMLA) certification form that she would require a six-month absence at work for surgery, chemotherapy, and potential radiation. Ms. Mullin submitted this FMLA form to the human resources department.

In May 2012, a few months after the cancer diagnosis, Casey Crump—a steward with the union Ms. Mullin belonged to—sent Ms. Mullin an email. In that email, Mr. Crump mentioned that he heard about Ms. Mullin's "condition" from Bonnie Wax, a human

resources manager.  Mr. Crump also noted that Ms. Wax believed that Ms. Mullin's breathing issues were caused by her tumor, not by any problems with the building.  Ms. Mullin was surprised to learn that Mr. Crump knew about her cancer diagnosis.  The only people she had told were a friend at work and Sandra Smith, a Veterans Service Center manager.

Ms. Mullin completed her cancer treatment in December 2012 and returned to work the following month.  She continued to work remotely three days a week and came into the office the other two days.  Shortly after she came back to work, she informed the Department that the issues in the building were worsening her health condition, and she asked to "further minimize" the time spent in the building.

On January 30, 2013, Ms. Mullin met with Ms. Clarke and a union representative.  At the meeting, Ms. Mullin requested additional accommodations.  These included working entirely from home or from a location other than the St. Petersburg office.  She also asked to meet another employee outside her building to hand off important paperwork so she would not have to go inside.

Four weeks later, the Department again agreed to move Ms. Mullin's workstation and to place a second air purifier in her office.  It also agreed to place her printer near her workstation to limit her movement outside of her workstation.

At a meeting held shortly thereafter, a union representative proposed permitting Ms. Mullin to work a half-day schedule on the

6                    Opinion of the Court                    22-12354

two days she was in the office. Ms. Mullin began working this proposed modified schedule but this accommodation was not formally approved. It appears that at some point the Department discovered this new work schedule and informed Ms. Mullin that her accommodations did not include this modified schedule.

## C.

In March 2013, a supervisor informed Ms. Clarke that Ms. Mullin was still having issues with the air purifiers. Ms. Clarke added a third air purifier to Ms. Mullin's office and tested the air quality.

The following month, on April 12, 2013, Ms. Mullin's doctor wrote a note to the Department recommending that Ms. Mullin be allowed to work entirely from home. He also explained that the air purifiers were not effective. Three days later, the Department permitted Ms. Mullin to work from home four days a week, come into work on Friday mornings from 7:00 A.M. to 11:00 A.M., and work the remainder of that day from home. Ms. Mullin informed the Department that these accommodations were unsatisfactory to her because they were "useless and potentially harmful."

On April 19, 2013, the Department permitted Ms. Mullin to work entirely from home. She was, however, required to meet someone outside the building on Friday mornings to exchange work-related papers. It is unclear whether Ms. Mullin continues to receive this accommodation.

### D.

Ms. Mullin brought suit in the district court after she filed a complaint—which she amended numerous times—with the Equal Employment Opportunity Commission. In her district court complaint, she asserted claims under the Rehabilitation Act for disability discrimination based on disparate treatment and failure to accommodate, unlawful disclosures and privacy violations, and retaliation (and/or a retaliatory hostile work environment).

## II. STANDARD OF REVIEW

We review de novo the grant of summary judgment, applying the same legal standard used by the district court. *See Taxinet Corp.*, 114 F.4th at 1230. Under Rule 56, summary judgment is warranted "when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Williams v. Radford*, 64 F.4th 1185, 1188 (11th Cir. 2023) (citation and internal quotation marks omitted).

## III. DISCUSSION

The Rehabilitation Act prohibits federal agencies from engaging in employment discrimination against otherwise qualified individuals with a disability. *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000). Specifically, qualified individuals with a disability shall not "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity re-

8                    Opinion of the Court                    22-12354

ceiving Federal financial assistance or under any program or activity conducted by any Executive agency" solely because of their disability. *See* 29 U.S.C. § 794(a).

"The standards used to determine whether [the Rehabilitation Act] has been violated . . . shall be the standards applied under [T]itle I of the Americans with Disabilities Act . . . and the provisions of [S]ections 501 through 504, and 510, of the Americans with Disabilities Act . . . , as such sections relate to employment." 29 U.S.C. § 794(d); *see also Ellis*, 432 F.3d at 1326 ("The standard for determining liability under the Rehabilitation Act is the same as that under the Americans with Disabilities Act . . . ; thus, cases involving the ADA are precedent for those involving the Rehabilitation Act."). With this backdrop, we address Ms. Mullin's Rehabilitation Act claims.

## A. Disability Discrimination

Ms. Mullin asserts a claim of disability discrimination against the Department under the Rehabilitation Act. The district court concluded that she failed to establish that she was discriminated against because of her disability. We agree with the district court.

"To establish a prima facie case of discrimination under the [Rehabilitation] Act, an individual must show that (1) [s]he has a disability; (2) [s]he is otherwise qualified for the position; and (3) [s]he was subjected to unlawful discrimination as the result of h[er] disability." *Ellis*, 432 F.3d at 1326 (quoting *Sutton v. Lader*, 185 F.3d 1203, 1207–08 (11th Cir. 1999)). To establish the third ele-

ment, the plaintiff must show that she suffered an adverse employment action because of her disability. *See id.* Importantly, the plaintiff must prove that the adverse employment action was "solely by reason of her . . . disability." 29 U.S.C. § 794(a). As a result, a claim of disability discrimination fails if the employer based the adverse employment action partially on disability and partially on other factors. *See Ellis*, 432 F.3d at 1326.

A claim of disability discrimination against an employer under the Rehabilitation Act may be established in two ways: (1) disparate treatment; or (2) failure to make a reasonable accommodation. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008) (explaining that the ADA and the Rehabilitation Act "recognize disparate treatment and reasonable accommodation theories").

Disparate treatment occurs when a covered entity treats a disabled individual differently than a non-disabled individual. *See* 42 U.S.C. § 12112(b). A disparate treatment claim requires a showing of discriminatory intent. *See Berg v. Fla. Dept. of Labor & Employment*, 163 F.3d 1251, 1254–55 (11th Cir. 1998).

A failure to accommodate claim arises when a covered entity fails its affirmative duty to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). A failure to make a reasonable

accommodation does not require a showing of discriminatory intent. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007) ("[A]n employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA . . . . There is no additional burden . . . ."). "An accommodation is reasonable if it enables the employee to perform the essential functions of the job." *Solloway v. Clayton*, 738 F. App'x 985, 987 (11th Cir. 2018) (per curiam) (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)); *see also Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1335 (11th Cir. 2022) ("[W]hen an employee triggers an employer's accommodation duties, the employer must expend time and expense to explore the universe of reasonable accommodations, identify one that is *mutually agreeable to the parties*, and implement it." (emphasis added)).

### 1. Disparate Treatment

As to her disparate treatment theory, Ms. Mullin argues that she suffered disability discrimination because the Department denied her request for advanced sick leave. *See* Appellant's Br. at 44–45.

The record reflects that, around May 4, 2012, Ms. Mullin requested advanced sick leave "of 72–80 hours . . . [to] take care of the post-operative period of 2 weeks followed by approximately 6 weeks of radiation . . . ." On May 7, 2012, Ms. Mullin's doctor provided the relevant documentation for her advanced sick leave request. That same day, the Department approved Ms. Mullin's request for 80 hours of advanced sick leave—the amount she initially

requested—in a memorandum. On May 10, 2024, the Department memorialized this decision in a Request for Leave or Approved Absence form signed by Kerri Witty, the Department Director.

The record further shows that the Department continued to approve advanced sick leave for Ms. Mullin between June and August of 2012, despite Ms. Mullin having "used all of her leave to include accrued and sick leave." The Department also admitted Ms. Mullin to the Voluntary Leave Transfer Program, from which she received donations in addition to her advanced sick leave.

The parties spar about whether Ms. Mullin was denied any request for sick leave, but this disagreement misses the mark. We have not found—and Ms. Mullin has not identified—anything in the record to show (or create a genuine issue of fact) that a request for sick for leave was denied solely because of her disability. In fact, she has not shown that any sick leave was denied even in part due to her disability.

We have identified three instances where Ms. Mullin's leave request was denied during the relevant period for her disparate treatment theory. None of these support Ms. Mullin's disparate treatment claim.

The first comes from Ms. Mullin's own testimony at her deposition. Ms. Mullin stated that at some point Ms. Clarke verbally denied her advanced sick leave request. But this testimony is belied by the record, which reflects that the Department ultimately granted her advanced sick leave request. *See Blanco v. Samuel*, 91 F.4th 1061, 1070 (11th Cir. 2024) ("[T]he court cannot discount a

party's testimony on summary judgment 'unless it is blatantly con-tradicted by the record, blatantly inconsistent, or incredible as a matter of law . . . .'" (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013))).  Even if we assume that Ms. Clarke orally denied the request, Ms. Mullin has failed to establish (or create a genuine issue of fact) that her request was denied solely because of her disability.

The second is based on a Department memorandum dated April 9, 2012, approving Ms. Mullin's FMLA application related to her cancer diagnosis.  This memorandum determined that Ms. Mullin "is entitled to a total of 12 workweeks or 480 hours of FMLA leave during a 12-month period," but noted that she "previously invoked her entitlement to FMLA on March 9, 2012 . . . ."  The memorandum concluded that Ms. Mullin "is not allowed an addi-tional 12 workweeks" until her current FMLA entitlement "period ends, and a new event or situation occurs that entitles [Ms. Mullin] to *another* period of . . . medical leave."

The third is based on a similar Department memorandum dated May 11, 2012, evaluating additional medical documentation for Ms. Mullin's FMLA application regarding the cancer diagnosis. This memorandum stated that an "employee is entitled to up to a total of 12 administrative workweeks of leave without pay . . . [and] [Ms. Mullin] can use a total of 480 hours for the entire FMLA enti-tlement period."  The memorandum concluded that Ms. Mullin was "not allowed an additional 12 workweeks [of leave] based on"

the additional medical documentation but notes that she could renew her entitlement at the end of her then current FMLA entitlement period.

These two Department memoranda fare no better for Ms. Mullin's disparate treatment theory. Neither denial—assuming they were denials—was based solely on her disability. The district court therefore did not err in granting summary judgment to the Department on the disparate treatment theory.

### 2. Failure to Accommodate

As to her failure to accommodate claim, Ms. Mullin argues that the Department failed to reasonably accommodate her by unduly delaying in providing her a full-time work-from-home accommodation in light of her known health conditions. *See* Appellant's Br. at 18–28. To avoid summary judgment, Ms. Mullin must present sufficient evidence to create an issue of fact as to whether the Department failed to reasonably accommodate her disability. She failed to do so. Viewing the record in the light most favorable to her, the Department provided reasonable accommodations for Ms. Mullin's disability and ultimately provided her with the accommodation she desired—working from home full time.

The failure to accommodate claim can be distilled to two main theories. First, Ms. Mullin argues that the Department unduly delayed in providing, in her view, the only reasonable accommodation for her medical conditions—a full-time work from home accommodation. Second, she argues that the Department failed to

provide her with reasonable accommodations during the interactive process despite the Department being aware of her medical conditions.

The parties dispute the length of the alleged delay before Ms. Mullin received a full-time work-from-home accommodation. Although the Department argues—and the district court agreed—that there was only a three-month delay, if any, Ms. Mullin argues that the Department unreasonably delayed in providing her requested accommodation for 10 months. Ms. Mullin's estimation of the delay is belied by the chronology of events and the record before us. The record reflects that Ms. Mullin was away from work on medical leave due to her cancer treatment during the latter half of 2012 and did not return to work on a regular basis until January 2013. Ms. Mullin cannot fairly cast the period in which she was away from work due to her cancer treatment as an unreasonable delay on the part of the Department. The delay in granting Ms. Mullin the accommodation of full-time work from home was therefore approximately three months.

The parties also dispute whether the Department provided Ms. Mullin a reasonable accommodation for her medical conditions. Ms. Mullin "bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows [her] to perform the job's essential functions." *Lucas*, 257 F.3d at 1255–56. The record indicates that before the cancer diagnosis and upon her return from the cancer treatment, the Department addressed each of Ms. Mullin's accommodation requests and provided her

22-12354                Opinion of the Court                15

with an accommodation.  Many of these accommodations were in direct response to Ms. Mullin's own requests and suggestions.  For example, before Ms. Mullin's cancer diagnosis, the Department altered her in-office work schedule, moved her workstation to a different part of the building, and provided her with an air purifier.  And in response to Ms. Mullin submitting an FMLA leave request that included her doctor recommending that she "be allowed to work from home with periodic trips to the work site as required," the Department formalized a three-day work from home schedule for Ms. Mullin.

Upon returning to work in January 2013, Ms. Mullin and the Department resumed the interactive process to identify a reasonable accommodation for her medical needs.  Between January and April of 2013, and in response to Ms. Mullin's complaints and requests, the Department moved Ms. Mullin's workstation to another part of the building and provided her with two additional air purifiers.  It also further modified her schedule to permit her to work from home four days a week and to only come to the office on Friday for four hours in the morning.  When these accommodations were unsatisfactory to Ms. Mullin, the Department permitted her to fully work from home and exchange work-related documents with another employee at the building on Fridays.

In reaching our conclusion, we find our reasoning in *Solloway* persuasive.  There, an employee suffered from post-traumatic stress disorder (PTSD) from a past sexual assault.  *See* 738 F. App'x at 986.  The employee later learned that her direct supervisor

was reprimanded for watching pornography at the workplace, which triggered the employee's PTSD. *See id.* The employee requested an accommodation to work from home full-time as a result. *See id.* While that request was pending, the employee received several accommodations to ensure that she would avoid her direct supervisor, including teleworking on days her direct supervisor was in the office and moving her office away from his. *See id.* The employer allowed these accommodations to continue for two years, even after the employee's request to work from home full-time was denied. *See id.* at 986–87. The employee made a second request to work from home full-time, which was denied again. *See id.* at 987. The employee was later placed on paid administrative leave with full benefits after the employer determined she was unable to perform the essential functions of her job. *See id.* The employee was ultimately reinstated and allowed to work from home full-time when her employer's work from home policy changed. *See id.*

We determined that the employer did not violate the Rehabilitation Act by denying the employee's request to telework full time. *See id.* at 988. Specifically, we concluded that "[a]lthough the [employer] denied her specific request for full-time telework, it not only allowed her to continue teleworking part-time but also required [her direct supervisor] to telework part-time on an alternate schedule so that she would not encounter him." *Id.* We also noted that the employee "eventually received her preferred accommodation of full-time telework" and never lost her job. *See id.* We thought it "unreasonable" to require the employer to "guarantee

that [the employee] would never encounter [her direct supervisor]." *Id.*

Here Ms. Mullin requested accommodations that would reduce her exposure to the building to avoid triggering her respiratory conditions.  In response, the Department provided several accommodations, including moving her workstation, providing her with air purifiers, and modifying her in-office schedule to reduce exposure.  When Ms. Mullin complained that a certain accommodation was ineffective or not satisfactory, the Department made further adjustments to accommodate her.  Although these accommodations may not have been the ones Ms. Mullin desired—*e.g.*, to work from home full-time—the Department was only required to provide a reasonable accommodation that allowed her "to perform the essential functions of the job."  *See id.* at 987; *see also Owens*, 52 F.4th at 1335 (noting that a reasonable accommodation must be "mutually agreeable to the parties"); *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020) ("[A]n employer is not required to accommodate an employee in *any* manner that the employee desires—or even provide that employee's preferred accommodation.").  Moreover, the Department ultimately granted Ms. Mullin's desired accommodation to work from home full time, just like the employer in *Solloway*.  *See* 738 F. App'x at 988 (noting that the employee "eventually received her preferred accommodation of full-time telework").

The Department made reasonable efforts to accommodate Ms. Mullin, and continually expanded her accommodations when

she complained.  Ms. Mullin's dissatisfaction with the accommodations she received does not, by itself, create an issue of fact with respect to her claim of disability discrimination.  As we have noted, "a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation." *Solloway*, 738 F. App'x at 988 (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997)); *see also D'Onofrio*, 964 F.3d at 1022 ("Of course, there are limits to the accommodations an employer must provide. . . . [A]n employer is not required to accommodate an employee in *any* manner that the employee desires—or even provide that employee's preferred accommodation.").  Moreover, an employer is not required to provide "the maximum accommodation or every conceivable accommodation possible."  *Stewart*, 117 F.3d at 1285–86 (quoting *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 947 (N.D. Ga. 1995)).  The employee is only entitled to a reasonable accommodation, not to the accommodation of her choice.  *See id.* at 1286.

Some courts have held that an unreasonable delay in providing an accommodation can violate the ADA or the Rehabilitation Act.  *See generally Mogenhan v. Napolitano*, 613 F.3d 1162, 1168 (D.C. Cir. 2010) (citing cases).  In assessing claims of unreasonable delay, courts consider "the length of the delay, the reasons for the delay, whether the employer has offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith."  *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1262–63 (10th Cir. 2001).  Here the three-month delay in granting Ms. Mullin the requested accommodation of full-time

work from home was not unreasonable, particularly given the intermediate additional accommodations provided by the Department in early 2013 (the moving of the workstation, the placement of two additional air purifiers in her workstation, and the modification of her in-office schedule). *Cf. Ward v. McDonald*, 762 F.3d 24, 34 n.5 (D.C. Cir. 2014) (stating that a three-month delay in granting a telework accommodation was not a "long delay").

The district court did not err in granting summary judgment to the Department on the failure to accommodate theory.

## B. Unlawful Disclosure Claim

Ms. Mullin claimed that the Department failed to protect and unlawfully disclosed her confidential and sensitive medical information. The district court granted summary judgment for the Department as to the disclosure claim. We conclude, however, that it erred in doing so because Ms. Mullin presented sufficient evidence to create issues of fact.

## 1. Legal Standard

The Rehabilitation Act incorporates the confidentiality provisions of the ADA. *See* 29 U.S.C. §§ 791(g), 794(d). In general, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Moreover, "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to

20                    Opinion of the Court                    22-12354

be job-related and consistent with business necessity."   42 U.S.C. § 12112(d)(4)(A).

The relevant regulation similarly states that "[a] covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity.  A covered entity may make inquiries into the ability of an employee to perform job-related functions." 29 C.F.R. § 1630.14(c).  Information obtained from an employee through a medical examination or inquiry "shall be collected and maintained on separate forms and in separate medical files and be treated as a confidential medical record . . . ." 29 C.F.R. § 1630.14(c)(1).  The Rehabilitation Act similarly provides that the information obtained is generally "treated as a confidential medical record" under 42 U.S.C. § 12112(d)(3)(B), subject to limited exceptions.  *See* 42 U.S.C. § 12112(d)(4)(C).

We have not addressed whether there is a private right of action under 42 U.S.C. § 12112(d)(4).  But we have "explicitly recognize[d] that a plaintiff has a private right of action under 42 U.S.C. § 12112(d)(2), irrespective of . . . disability status." *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1214 (11th Cir. 2010).  We have also noted that "§ 12112(d)(2)(A) and (d)(4)(A) are parallel provisions with similar language and virtually identical prohibitions concerning medical inquiries . . . [and] proof of damages requirement . . . ." *Russell v. City of Mobile Police Dep't*, 552 F. App'x 905, 907 (11th Cir. 2014) (per curiam).[3]

---

[3] *Russell* is unpublished, but we find it persuasive.

We therefore recognize a private right of action under 42 U.S.C. § 12112(d)(4) irrespective of disability status. *See Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1310–11 (11th Cir. 2013) (implying a private right of action under 42 U.S.C. § 12112(d)(4) and recognizing "that § 12112(d)(4)(A) [also] protects employees who are not disabled"); *see also Russell*, 552 F. App'x at 906–07 ("An employee may raise a § 12112(d)(4)(A) claim whether or not she is disabled . . . [and] the proof of damages requirement set in *Harrison* equally applies to cases involving allegedly improper inquiries under § 12112(d)(4)(A)."). To bring a claim under § 12112(d)(4), an employee must show that (1) the employer either made an unlawful inquiry in violation of § 12112(d)(4)(A) or violated its confidentiality requirements after making a proper inquiry under § 12112(d)(4)(C), and (2) the employee suffered a tangible injury from the unlawful inquiry or disclosure. *See* 42 U.S.C. § 12112(d)(4); *Russell*, 552 F. App'x at 906.

### 2. Ms. Mullin's Claim

To get to a jury on her unlawful disclosure claim under § 12112(d)(4)(C), Ms. Mullin must present sufficient evidence to create issues of fact on whether the Department made a proper inquiry into her medical condition, whether the Department disclosed the results of that inquiry to persons in violation of the Rehabilitation Act, and whether she suffered a tangible injury because of the unlawful disclosure. *See* 42 U.S.C. § 12112(d)(4)(C); *Russell*, 552 F. App'x at 906. The district court ruled that Ms. Mullin failed to show that she suffered any harm because of the Department's alleged improper disclosure by Ms. Wax. As a result, the district

court did not address whether the Department made an inquiry; it noted, however, in a footnote that it was "not at all convinced" that an inquiry occurred when Ms. Mullin disclosed her medical information in a required FMLA form requesting leave for her cancer treatment.

On appeal, the Department argues that Ms. Mullin's unlawful disclosure claim fails because it did not make an inquiry in the first place. The Department contends that it did not make an inquiry because the FMLA leave form "is not an inquiry that is intended to reveal or necessitates revealing a disability [as] an employee could be eligible for FMLA leave based on a serious medical condition that is not considered a disability . . . ." Appellee's Br. at 42. The Department alternatively argues that "[e]ven if an inquiry was made," it remains entitled to summary judgment because Ms. Mullin failed to show that her medical condition was confidential at the time of the disclosure and because she failed to establish that she suffered a tangible injury from the disclosure.

We disagree with the Department's arguments. Viewing the record in the light most favorable to Ms. Mullin as the nonmoving party, *see Williams*, 64 F.4th at 1188, we believe that an inquiry was made and that there are issues of fact as to whether there was an unlawful disclosure stemming from that inquiry.

### a. Whether There Was an Inquiry

As a general matter, an employer must request a medical examination or inquire into an employee's medical status for there to be an "inquiry" under the Rehabilitation Act. *See* 42 U.S.C.

§ 12112(d)(4)(A); 29 C.F.R. § 1630.14(c).  An employee's voluntary disclosure of a medical diagnosis to a supervisor or co-worker is not an examination or inquiry for purposes of § 12112(d)(4).  *See Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000) (finding no unlawful disclosure where the matter disclosed at issue "was not of the result of an examination ordered by [the employer], but of a voluntary disclosure" by the employee to the employer).

We have not previously addressed whether an employee's disclosure of confidential medical information in an FMLA leave form constitutes an inquiry by the employer within the meaning of the Rehabilitation Act.  We now hold that when an employer conditions an employee's access to statutorily protected leave on the submission of medical information, that is an "inquiry" under § 12112(d)(4). The statute prohibits employers from making medical inquiries unless they are job-related and consistent with business necessity. That restriction cannot be avoided simply because the employer's demand for information is embedded in the mechanics of leave approval.

This conclusion is consistent with the D.C. Circuit's reasoning in *Doe v. United States Postal Service*, 317 F.3d 339 (D.C. Cir. 2003).  In *Doe*, an employee of the United States Postal Service missed several weeks of work due to an AIDS-related illness. *See id.* at 341.  The employee's direct supervisor sent the employee a letter regarding his extended absence and attached a Department of Labor Form WH 380 (the FMLA form)—the same form that Ms. Mullin completed—stating that the employee's "condition may

qualify [him] to be covered by the Family and Medical Leave Poli-cies." *Id.* The employee completed the FMLA form and disclosed his HIV status on it. *See id.* When the employee returned to work, he learned that several co-workers were aware of his HIV status, and several of them identified a supervisor to whom he had not disclosed his status as the source of the information. *See id.* The employee sued under the Rehabilitation Act and the Privacy Act. *See id.* The district court granted the Postal Service's motion for summary judgment in part because it concluded that the FMLA form was not an employer inquiry. The D.C. Circuit disagreed and reversed.

The D.C. Circuit held in *Doe* that the FMLA form was an inquiry and explained that the employee "revealed his medical di-agnosis . . . only after the [Postal] Service, through his direct super-visor, told him in writing that he would face disciplinary proceed-ings unless he completed either the FMLA form or a medical cer-tificate explaining" the nature of his illness. *Id.* at 344. The D.C. Circuit reasoned that even if the employee could "be said to have submitted the FMLA request voluntarily, . . . that hardly mean[t] he volunteered his medical diagnosis." *Id.* The D.C. Circuit went on to conclude that "[t]he Postal Service conditioned [the em-ployee's] receipt of FMLA leave on his submission of supporting medical documentation, as the FMLA authorized it to do. . . . [I]t was thus the Postal Service, acting pursuant to this statutory au-thorization, not [the employee], that initiated the inquiry into his medical condition by asking for this medical certification." *Id.* Be-cause the Postal Service conditioned eligibility for FMLA leave on

22-12354                Opinion of the Court                        25

the employee disclosing medical information that established eligibility, the FMLA form constituted an "inquiry." *See id.* To hold otherwise, the D.C. Circuit noted, would lead to employees being forced "to choose between waiving their right to avoid being publicly identified as having a disability and exercising their statutory rights . . . ." *Id.*

The same reasoning applies here. The record shows that in March 2012 Ms. Mullin sought a work-from-home accommodation and also applied for FMLA leave related to her asthma.[4] On March 14, 2012, the Department approved her FMLA leave, totaling 12 work weeks, and told her, "If it should become necessary for you to extend your entitlement beyond the current certification, you will be required to provide an updated physician's statement from your healthcare provider."

A March 14 memorandum from Human Resources to Veterans Service Center Manager Sandra Smith also recounted that "The employee was informed (in writing) by Human Resources that new medical documentation will be required if their leave exceeds the amount recommended by the Health Care Provider." A few lines later, the memorandum says, "It is the responsibility of

---

[4] On March 13, an internal email chain that the Department appended to its motion for summary judgment stated that "Maybe [the Department] can move [Mullin's accommodation request] quickly *if there is* med[ical] documentation to support[ it.]" (emphasis added).

the supervisor to . . . [n]otify the employee that new medical documentation is required when leave usage is not intermittent as defined by the Health Care Provider."

On March 20, 2012, the Department approved her work-from-home accommodation for three days working from home and two days working in the office.  The approval form stated that

> Reasonable accommodations are an interactive process requiring communication to ensure that the accommodation continues to meet your workplace requirements.  As a result, the agency may periodically ask you to provide updated medical evidence to establish whether the accommodation should continue and/or be changed.  If your condition changes, or if a change in the accommodation is warranted, it is your responsibility to notify human resources.

On March 23, 2012, Ms. Mullin's doctor submitted an FMLA form disclosing her cancer diagnosis and stating that she would be out continuously for six months.  On April 9, 2012, the Department approved that request but noted that she was not eligible for a new 12-week allotment of leave until her prior entitlement period for her previously-approved FMLA leave expired.  That letter, like the first, told Ms. Mullin that "If it should become necessary for you to extend your entitlement beyond the current certification of 30 days, you may be required to provide an updated physician's statement from your healthcare provider."

22-12354                Opinion of the Court                27

In short, the record shows that when Ms. Mullin requested leave, the Department told her approval required submission of additional medical documentation.[5] So when Ms. Mullin was diagnosed with cancer, she simply did what the Department had already told her she must do: submit medical documentation. She did not volunteer the information; she disclosed it because, under the Department's previous letters, it was apparent that disclosing the information was the only way to maintain her leave and her pay. *Accord Doe*, 317 F.3d at 344. That kind of disclosure is not "voluntary" in any meaningful sense. *See id.*

---

[5] Ms. Mullin's brief stated that the Department required her to complete an FMLA form to receive her statutory leave. The Department did not dispute that in its answer brief. Rather, it accepted the premise and argued only that: "[Ms. Mullin] claims that the VA made an inquiry when it required her to disclose medical information in an FMLA certification form in order to obtain FMLA leave. . . . But, as a matter of law, that form is not an inquiry . . . ." At oral argument, Ms. Mullin's counsel reaffirmed that the Department required employees to submit an FMLA form as a precondition to taking leave. The Department again did not dispute the point, instead reiterating its position that requiring an FMLA form is never an inquiry under the Rehabilitation Act.

We thus take as undisputed that the Department's policy required employees to submit an FMLA form to obtain leave. We express no view on situations where no policy or practice requires employees to submit medical documentation to exercise their statutory right to leave. *Contra* Dissenting Op. at 3 (incorrectly recasting our holding as "*any time* an FMLA form is submitted—*regardless of whether the employee submits it voluntarily* or at the request of the employer—there is an inquiry by the employer under § 12112(d)" (emphases added)).

28                    Opinion of the Court                    22-12354

The upshot is that when an employee must share medical information to receive benefits guaranteed by law, the requirement operates as an inquiry by the employer. We therefore hold that, as a matter of law, there was an inquiry here.

The partial dissent reaches a different conclusion, but it blurs two distinct legal questions: whether the Department made a medical inquiry, and whether it later disclosed information obtained through that inquiry. Those questions are analytically separate. The first concerns the scope of employer conduct regulated by § 12112(d)(4)(A); the second involves whether the employer violated its confidentiality obligations under § 12112(d)(4)(C). We address only the first here and conclude that the Department did make an inquiry.

The partial dissent's reasoning rests on the premise that Ms. Mullin's (possible) earlier, voluntary disclosure of her cancer diagnosis forecloses a finding that the Department later initiated an inquiry.[6] But nothing in the statute supports the result. Section 12112(d)(4) prohibits employers from making medical inquiries unless they are job-related and consistent with business necessity. It does not say—expressly or by implication—that an employee's

---

[6] It bears repeating that the Department's only argument on the inquiry issue is that an FMLA form is not an inquiry as a matter of law. *See supra* note 5. Unlike the partial dissent, neither the Department nor Ms. Mullin has ever argued that a factual dispute about a prior voluntary disclosure has any bearing on the inquiry analysis.

22-12354                Opinion of the Court                29

prior voluntary disclosure prevents a finding of a subsequent statutory inquiry. And the partial dissent cites no case adopting that theory.[7]

To the extent Ms. Mullin disclosed her diagnosis before submitting the FMLA form, that fact bears on whether the Department unlawfully disclosed confidential information under § 12112(d)(4)(C). But it has no bearing on whether an inquiry occurred under § 12112(d)(4)(A). The statute treats those as distinct questions, and so must we. If both a prior voluntary disclosure and a later inquiry happened, the proper question is whether the disclosure stemmed from the inquiry (which is prohibited by the Act) or from the voluntary disclosure (which is not covered by the Act).

The partial dissent's contrary approach would create a sweeping exception. Employers could bypass the Rehabilitation Act's inquiry safeguards by seizing on a prior voluntary disclosure and treating all future demands for medical documentation as outside the statute's reach. But where, as here, an employer requires medical information as a condition of leave approval, that demand qualifies as a statutory inquiry—regardless of any earlier voluntary

---

[7] The partial dissent's reliance on *Cash v. Smith*, 231 F.3d 1301 (11th Cir. 2001), only underscores the distinction between an inquiry and a voluntary disclosure. There, we held that the employer was not liable because the challenged disclosure involved information the employee had volunteered—not information obtained through an inquiry. *Id.* at 1307–08. Neither *Cash* nor any case the partial dissent cites supports the proposition that a prior voluntary disclosure forecloses the possibility of a later statutory inquiry.

disclosure.  That conclusion follows from both the text and structure of the Act.

### b. Whether There Was an Unlawful Disclosure

Having found that the Department made an inquiry into Ms. Mullin's medical condition, Ms. Mullin must now show that confidential information *from that inquiry* was disclosed in violation of the Rehabilitation Act.  The district court did not address whether Ms. Wax's disclosure to Mr. Crump of Ms. Mullin's cancer diagnosis amounted to an unlawful disclosure.

The Department argues that summary judgment is appropriate because Ms. Mullin failed to show that her cancer diagnosis was confidential.  It maintains that there is no proof that Mr. Crump's knowledge of Ms. Mullin's diagnosis came first from Ms. Wax, and that Ms. Mullin told other people about her cancer diagnosis before she received Mr. Crump's email.

Given that we are in a summary judgment posture and must view the evidence and inferences in the light most favorable to Ms. Mullin, we are unpersuaded by the Department's argument.  There is sufficient evidence in the record for a jury to find that Ms. Wax was the source of the allegedly unlawful disclosure and that she obtained the information from the FMLA form.  First, an internal Department memorandum approving Ms. Mullin's FMLA leave request for her cancer diagnosis, which was dated before Mr. Crump's email and signed by Ms. Wax, stated that "[t]he specific medical condition was intentionally left off . . . to avoid accidental disclosure."  Second, Mr. Crump's email to Ms. Mullin—which

came after the Department had approved Mr. Mullin's FMLA request—stated that Mr. Crump and Ms. Wax discussed Ms. Mullin's cancer diagnosis. Third, although Ms. Mullin said she spoke to a few people—including friends outside of work and doctors—about her diagnosis, there is insufficient evidence that Mr. Crump learned of her diagnosis from anyone other than Ms. Wax. Of course, sharing a medical condition with a few relatives or close friends does not, as a matter of law, make the condition non-confidential. Fourth, Ms. Mullin testified that she never told Ms. Wax about her cancer diagnosis.

There is also an issue of fact as to whether Mr. Crump learned of the cancer diagnosis before Ms. Mullin told anyone at work. In cases involving disclosure of confidential information from private records, circumstantial evidence may suffice to defeat a motion for summary judgment, as "plaintiffs can rarely produce direct evidence that the government has disclosed confidential information obtained from their private records . . . ." *Doe*, 317 F.3d at 343. The D.C. Circuit in *Doe*, for example, found that the employee presented sufficient circumstantial evidence to create a genuine issue of fact as to when and from whom "his HIV status had become common knowledge among his co-workers," including that the disclosure came after he submitted the FMLA form and that the source of the information was from a specific management-level supervisor. *Id.* at 341–43. Here, a reasonable jury could find that Ms. Wax disclosed Ms. Mullin's cancer diagnosis to Mr. Crump after the FMLA form was submitted. As a result, Ms.

Mullin survives summary judgment on the inquiry and disclosure aspects of her unlawful disclosure claim.

### c. Whether Ms. Mullin Suffered a Tangible Injury

For Ms. Mullin's unlawful disclosure claim to proceed past summary judgment, she must also show (or create an issue of fact) that she suffered a tangible injury from the alleged unlawful disclosure of her cancer diagnosis. The district court believed that Ms. Mullin failed to present "more than a scintilla of evidence of a tangible injury resulting from the alleged disclosure of her breast cancer diagnosis." We disagree.

To succeed on an unlawful disclosure claim, a "plaintiff [must] at least show some damages (emotional, pecuniary, or otherwise) caused by a § 12112(d) violation." *Harrison*, 593 F.3d at 1216–17; *see also Russell*, 552 F. App'x at 907 (holding that an employee who alleges an unlawful disclosure in violation of § 12112(d)(4)(A) "must show damages—emotional, pecuniary, or otherwise"). As one of our sister circuits aptly stated, in the § 12112(d)(2)(A) context the "damages liability . . . must be based on something more than a mere violation of that provision. There must be some cognizable injury in fact of which the violation is a legal and proximate cause for damages to arise from a single violation." *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 562 (5th Cir. 1998); *see also, e.g.*, *Hustvet v. Allina Health Sys.*, 910 F.3d 399, 406–07 (8th Cir. 2018) ("If a violation occurs, it is not necessary that an applicant be disabled to bring a claim under § 12112(d). The appli-

cant must, however, establish the prospective employer's 'violation of the ADA caused some sort of tangible injury.'" (quoting *Cossette v. Minn. Power & Light*, 188 F.3d 964, 970 (8th Cir. 1999))); *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 519 (3d Cir. 2001) (noting that some circuits require a showing of the "existence of an injury-in-fact," such as "actual damage[s] (emotional, pecuniary, or otherwise)" for a plaintiff to have a cause of action for a violation of § 12112(d)).

Ms. Mullin alleged that she suffered emotional distress because of the alleged unlawful disclosure of her cancer diagnosis. She testified as follows during her deposition concerning her emotional distress:

> Q. . . . Can you tell me how . . . Mrs. Wax's conversation with [Mr.] Crump about your cancer and your health issues harmed you?
>
> A. It still harms me.
>
> Q. And how did it harm you?
>
> A. I had cancer and I just had to get things in order so I could treat my cancer. And Bonnie [Wax] had to interject her issues around the building and defending the building and she-- my surgery, the first one, I went under anesthesia worried about Bonnie Wax and what she was going to do to me. I came out of anesthesia that way. I spent more time crying and concerned. At times I had no pay, nothing, and I never knew if I'd get paid. The anxiety-- what the anxiety

34                    Opinion of the Court                    22-12354

> did to my body and my brain and her callousness.  It
> was breast cancer. . . .
>
> Q. . . . So is there any other way that the conversation
> between Mrs. Wax and [Mr.] Crump harmed you or
> affected you?
>
> A. Did the conversation between-- it distracted me
> from caring for myself.  It distracted me from honor-
> ing my body and focusing on healing and health.

This testimony was enough to withstand summary judgment on the injury aspect of the unlawful disclosure claim.  *See Walters v. Fast AC, LLC*, 60 F.4th 642, 648 (11th Cir. 2023) ("Walters's deposition testimony describing his lost time, economic harm, and emotional distress is sufficient evidence . . . to survive summary judgment.").

Although documentation of emotional distress is not required, *see id.*, we note that the record also contains two letters from the Department of Labor Office of Workers' Compensation Programs updating Ms. Mullin's medical conditions in her file.  The first is a letter dated October 26, 2015, which updates her diagnosed conditions to include PTSD.  The second is a letter dated February 2, 2017, which updates her diagnosed conditions to include major depressive disorder.  Ms. Mullin does not rely on these two letters to support her claim of a tangible injury and it is unclear whether either diagnosis is related to her unlawful disclosure claim.  But if those diagnoses are connected to the alleged unlawful disclosure, a jury could reasonably find that Ms. Mullin suffered a tangible injury

from the disclosure—for example, anxiety that developed into PTSD and/or depression.[8]

In short, there are issues of fact as to whether Ms. Wax improperly disclosed Ms. Mullin's confidential cancer diagnosis, whether Ms. Wax obtained that information from the FMLA form or from Ms. Mullin's voluntary disclosure, and whether Ms. Mullin suffered a tangible injury as a result. The district court erred in granting summary judgment in favor of the Department on Ms. Mullin's unlawful disclosure claim.

### C. Retaliation and Hostile Work Environment Claims

Ms. Mullin asserted claims of retaliation (and/or a retaliatory hostile work environment) based on her disability. We agree with the district court that the Department was entitled to summary judgment on these claims. We address retaliation first and then move on to retaliatory hostile work environment.

### 1. Retaliation

To establish a claim of retaliation, Ms. Mullin must prove that she engaged in statutorily protected activity, that she suffered a materially adverse action, and that there was some causal relation between the two events. *See Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 (11th Cir. 2021). As to the second element, she must show that the adverse action "well might have dissuaded a

---

[8] Because the parties did not brief whether Ms. Mullin's diagnoses of PTSD and depression were caused by or related to the alleged unlawful disclosure of her cancer diagnosis, we do not decide that question here.

reasonable worker from making or supporting a charge of discrimination." *Monahgan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

The district court granted the Department's motion for summary judgment on the retaliation claim because it concluded that Ms. Mullin had not established a causal connection between protected activity and any materially adverse action. We need not reach this issue because Ms. Mullin's retaliation claim is simply a claim for a failure to accommodate disguised as retaliation.

Ms. Mullin's theory is that the Department's alleged denial of her requests for accommodation was retaliatory. *See* Appellant's Br. at 42. This is merely an attempt to reassert a disability discrimination claim, which we have explained will not itself sustain a claim of retaliation. *See Lucas*, 257 F.3d at 1261 ("Lucas also contends that Grainger took adverse action against him by failing to reasonably accommodate him . . . . But this contention merely reclothes Lucas' ADA discrimination claim, which we have already rejected, and it fares no better in this garb."); *see also Stewart*, 117 F.3d at 1288 ("[T]he acts Stewart describes relate directly to her 'reasonable accommodation' discrimination claim, not her retaliation claim, and accordingly provide no basis for denying summary judgment on this issue."). We therefore affirm the district court's grant of summary judgment on the retaliation claim.

### 2. Retaliatory Hostile Work Environment

As the district court noted, we have not opined on whether a retaliatory hostile work environment claim can be properly asserted under the Rehabilitation Act or the ADA. We need not resolve that issue here because even if such a claim is cognizable, Ms. Mullin has failed to identify any issues of fact with respect to the essential elements of that claim.

To state a claim for hostile work environment, a plaintiff must establish that (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on a protected characteristic; (4) that the harassment was "sufficiently severe or pervasive" to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that her employer was responsible under either a theory of vicarious or direct liability. *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc). The fourth element—whether the harassment was sufficiently severe or pervasive—has a subjective component and an objective component. *See id.* at 809. This means that the employee must "subjectively perceive" the harassment as severe or pervasive enough to change the terms or conditions of employment, and this perception must be objectively reasonable. *See id.* at 808–09. In assessing the objective component, we consider the allegedly discriminatory conduct's "frequency . . . ; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Viewing the record in the light most favorable to Ms. Mullin, we agree with the district court that she did not provide evidence demonstrating how the Department's handling of her continued requests for accommodations was sufficiently "severe or pervasive." Ms. Mullin's allegations reflect her dissatisfaction with the many accommodations the Department provided at her request for her ongoing issues. Although the accommodations Ms. Mullin received before she was eventually granted permission to fully work from home may not have been exactly what she wanted, a jury could not reasonably find that the Department's attempts to accommodate Ms. Mullin were sufficiently severe and pervasive so as to be objectively hostile and abusive. Accordingly, the district court did not err in granting summary judgment on the hostile work environment claim based on disability.[9]

## IV. CONCLUSION

We affirm the district court's summary judgment order as to Ms. Mullin's claims of disability discrimination, retaliation, and retaliatory hostile work environment. We reverse the district

---

[9] We need not address whether Ms. Mullin established the other necessary elements of a hostile work of environment claim.

22-12354                Opinion of the Court                39

court's summary judgment order as to Ms. Mullin's unlawful disclosure claim and remand for further proceedings on that claim.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

22-12354                TJOFLAT, J., Concurring                1

TJOFLAT, Circuit Judge, concurring:

I write separately to flag a defect that, while not raised on appeal, jumps off the page: Ms. Mullin's complaint is a shotgun pleading. It should not have proceeded as written.

The body of the complaint spans 38 pages and includes 184 numbered paragraphs. The factual narrative begins at paragraph 12 and runs through paragraph 158. These allegations cover a host of subjects—workplace interactions, asthma attacks, accommodation requests, medical disclosures, and more. Each of the complaint's four counts—though resting on different legal theories—incorporates the entire factual section wholesale. And they go further still.

Count 1[1] incorporates paragraphs 1 through 159, which includes every paragraph leading up to and including the opening line of Count 1 itself. Count 2[2] incorporates paragraphs 1 through 165, sweeping in the full factual narrative and most of Count 1. Count 3[3] does the same. Count 4[4] goes even further. It first alleges that "[t]he allegations in paragraphs 1–167 are realleged as if set forth fully herein" and then again states that "Defendant is liable

---

[1] Count 1 alleges disability discrimination under the Rehabilitation Act. It comprises paragraphs 159 through 167.

[2] Count 2 alleges a failure to accommodate under the Rehabilitation Act. It comprises paragraphs 168 through 172.

[3] Count 3 alleges an unlawful disclosure under the Rehabilitation Act. It comprises paragraphs 173 through 178.

[4] Count 4 alleges a hostile work environment under Title VII. It comprises paragraphs 179 through 184.

2                    TJOFLAT, J., Concurring                    22-12354

for the retaliation alleged herein including, but not limited to, paragraphs 1 through 159." The result: every count is tethered to every fact, no matter how irrelevant.

And the sprawl does not end there. Appended to the complaint are 53 exhibits spanning 930 pages.[5] Those exhibits are referenced throughout the complaint and—because each count adopts the factual narrative wholesale—every reference to each exhibit is swept into every count by incorporation.

Ms. Mullin's complaint is not a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). It is a mockery of our pleading standards and a paradigmatic shotgun pleading.[6] *See, e.g.*, *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1354, 1356 (11th Cir. 2018).

---

[5] *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

[6] We have identified four types of shotgun pleadings. First "is a complaint containing multiple counts where each count adopts the allegations of all preceding counts." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015). Second "is a complaint that [is] replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id.* at 1322. Third "is one that commits the sin of not separating into a different count each cause of action or claim for relief." *Id.* at 1323. And fourth "is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* The complaint here falls into the first category. *See id.* at 1321 n.11 (listing similar cases).

22-12354                TJOFLAT, J., Concurring                3

We have repeatedly condemned shotgun pleadings because they "violate[] either Federal Rule of Civil Procedure 8(a)(2) or Rule 10(b), or both." *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021). These rules serve a purpose:

> to require the pleader to present his claims discretely and succinctly, so that, his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not.

*T.D.S. Inc. v. Shelby Mut. Ins.*, 760 F.2d 1520, 1543 n.14 (11th Cir. 1985) (Tjoflat, J., dissenting).

This case illustrates the problem. Count 3, for example, alleges that the Department violated the Rehabilitation Act by disclosing Ms. Mullin's breast cancer diagnosis. That count hinges on a single alleged disclosure. Yet it incorporates over a hundred paragraphs of unrelated material—allegations about asthma, delayed accommodations, and intra-office conflict. That indiscriminate incorporation muddies the claim, burdens the defense, and invites the court to sift through the narrative to reconstruct a viable theory. That is not the court's role,[7] and it is not the defendant's burden. It is the plaintiff's obligation "to separate the wheat from the

---

[7] "[D]istrict courts are flatly forbidden from scouring shotgun complaints to craft a potentially viable claim for a plaintiff. By digging through a complaint

chaff." *See Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1045 n.39 (11th Cir. 2014); *Est. of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020).

The strain that shotgun pleadings impose on the judiciary is substantial. As I explained, "[t]he federal judiciary is a system of scarce resources, and 'it is not the proper function of courts in this Circuit to parse out incomprehensible allegations.'" *Barmapov*, 986 F.3d at 1327–28 (Tjoflat, J., concurring) (quoting *Est. of Bass*, 947 F.3d at 1358) (alterations adopted). "Our district courts have neither the manpower nor the time to sift through a morass of irrelevant facts in order to piece together claims for plaintiff's counsel." *Id.*; *see also id.* at 1327 (explaining that it "may seem like strong medicine" to "dispos[e] of . . . otherwise viable claims because a plaintiff's lawyer pled *too many* facts" but "it is strong medicine . . . for good reason").

"The persistence of the shotgun pleading problem is particularly frustrating because the relevant actors all have it within their power to avoid it." *Paylor v. Hartford Fire Ins.*, 748 F.3d 1117, 1127 (11th Cir. 2014). Plaintiffs should not file them, defendants should move to either dismiss them or request a more definite statement, and district courts should sua sponte strike them. *See id.* at 1127–

---

in search of a valid claim, the courts 'would give the appearance of lawyering for one side of the controversy.' This in turn, would cast doubt on the impartiality of the judiciary. Such a result is plainly inconsistent with the oath to which each judge has sworn." *Barmapov*, 986 F.3d at 1328 (Tjoflat, J., concurring) (quoting *Jackson*, 898 F.3d at 1355 n.6).

22-12354                    TJOFLAT, J., Concurring                    5

28; *Vargas v. Lincare, Inc.*, 135 F.4th 1150, 1163 (11th Cir. 2025) (Tjoflat, J., concurring). Inexplicably, though, no party here exercised those tools, and the shotgun complaint advanced without challenge. That is unacceptable.

We have been crystal clear: when faced with a shotgun pleading, the district court should require repleading. *See, e.g., Est. of Bass*, 947 F.3d at 1358 ("[W]e have stated that a district court that receives a shotgun pleading should strike it and instruct counsel to replead the case—even if the other party does not move the court to strike the pleading." (citations omitted)). We have that rule because "[s]hotgun pleadings . . . exact an intolerable toll on the trial court's docket, lead to unnecessary and unchannelled discovery, and impose unwarranted expense on the litigants, the court and the court's parajudicial personnel and resources." *Cramer v. Florida*, 117 F.3d 1258, 1263 (11th Cir. 1997). Beyond the district court's docket,

> When a district court fails to squeeze a pleading down and determine whether it complies with Rules 8(a)(2) and 10(b), appellate courts are required to pore over the record and rebuild the case from scratch. This is a herculean undertaking: appellate courts are simply too far removed from the underlying facts to complete the task successfully and efficiently.

*Barmapov*, 986 F.3d at 1329 (Tjoflat, J., concurring).

The Department, too, should have known better than to let the complaint pass without objection. Instead, it responded in kind. Where Ms. Mullin incorporated by reference paragraphs wholly irrelevant to a given count, the Department incorporated answers

wholly irrelevant in turn. And "[r]ather than availing itself of the protective tools in the Federal Rules of Civil Procedure, [the Department] responded to [Ms. Mullin's] shotgun pleading with a shotgun answer: [7] one-line affirmative defenses, none of which refers to a particular count." *See Paylor*, 748 F.3d at 1127. Yet because the Department never moved to dismiss the complaint,[8] and because Ms. Mullin never moved to strike any of the defenses under Rule 12(f), the sufficiency of the defenses was never presented to the District Court for resolution.

To be sure, the shotgun nature of the complaint is not before us in this appeal. But that does not mean we should ignore it. We have spent decades condemning these pleadings, and yet, they keep coming. The rules are clear, the law is settled, and the consequences are costly. We have put it where the goats can get it. Enough is enough.

---

[8] Federal Rule of Civil Procedure 11(b)(2) requires that an attorney present defenses only when "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law." The Department's failure to invoke—or even mention—these defenses in the course of litigation raises a serious question whether they were in fact warranted under Rule 11.

22-12354  JORDAN, J., Concurring in Part & Dissenting in Part      1

JORDAN, Circuit Judge, Concurring in Part and Dissenting in Part:

I join the majority's opinion as to all but Part III.B.  As to Part III.B, I agree with some of the analysis but disagree with the majority's resolution of whether the Department initiated an inquiry for purposes of 42 U.S.C. § 12112(d)(4).

Like the majority, I find *Doe v. United States Postal Service*, 317 F.3d 339, 343–45 (D.C. Cir. 2003), persuasive and believe it should be followed insofar as it holds that an FMLA form can be an inquiry under § 12112(d)(4) when it is provided by the employer to the employee without the employee having first disclosed her medical condition.  Nevertheless, the facts in *Doe* differ from those here and that case therefore does not control the result here.

In *Doe*, the employer provided the FMLA form to the employee first in a letter regarding the employee's extended absence. *See id.* at 341.  The employee subsequently submitted the form to his employer and, upon returning to work, found out that his co-workers had learned of his medical condition from a supervisor. *See id.*  Because the employee submitted the FMLA form in response to the employer's letter, and because the form asked for medical information, the D.C. Circuit concluded that there was an inquiry by the employer. *See id.* at 344.

The record before us in this case is not as clear, and there is a genuine issue of fact as to whether the Department made an inquiry into Ms. Mullin's medical condition, i.e., her cancer diagnosis.  First, the record suggests that Ms. Mullin had previously told a co-worker and Sandra Smith, a Veterans Service Center manager,

2      JORDAN, J., Concurring in Part & Dissenting in Part 22-12354

of her cancer diagnosis. *See, e.g.,* D.E. 32-2 at 12–13, 92. Second, Ms. Mullin cannot recall whether the Department provided her with the FMLA form and if so when. *See id.* at 89. Third, it looks like Ms. Mullin voluntarily submitted the FMLA form to the Department with the medical provider's portion already completed, and that portion set out her cancer diagnosis. *See, e.g., id.* at 89, 90–91.

As the majority explains, there were several communications from the Department indicating that Ms. Mullin was to provide an updated physician statement if she needed to extend her previous requests for FMLA leave. And the FMLA form itself required Ms. Mullin to submit a medical certification to support her request for leave. Yet the record indicates that the alleged disclosure of Ms. Mullin's cancer diagnosis by Bonnie Wax took place on March 3, 2012—meaning that the condition had been disclosed by that date—and Ms. Mullin did not turn in her FMLA form before March 23, 2012. *Compare* D.E. 34-1 at 163–64 (Ms. Wax's sworn testimony before the EEO investigator), *with* D.E. 32-2 at 490–94 (FMLA form).

We have previously stated that § 12112(d) does "not govern voluntary disclosures initiated by the employee," and instead "enumerates the situations in which an employer may require an employee to submit to a medical examination . . . [and] the results of any such examination shall be considered confidential . . . ." *Cash v. Smith*, 231 F.3d 1301, 1307–08 (11th Cir. 2011). Our sister circuits

have similarly held that voluntary disclosures of medical information—as opposed to those acquired from a medical inquiry or examination first requested or ordered by the employer—do not constitute an inquiry for purposes of § 12112(d). *See, e.g., Taylor v. City of Shreveport*, 798 F.3d 276, 288 (5th Cir. 2015) ("Importantly, § 12112(d) prohibits an employer from disclosing an employee's medical information *only if* the employer first acquired the information *as a result of a medical inquiry or examination* as those terms are defined in the ADA. If the employee voluntarily divulges the medical information to the employer without the employer specifically demanding the information first, . . . then the employer has no duty under § 12112(d) to keep that information confidential."); *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1047 (10th Cir. 2011) (noting that the statute "on its face, . . . does not apply to or protect information that is *voluntarily* disclosed by an employee unless it is elicited during an authorized employment-related medical examination or inquiry").

As the majority apparently sees things, any time an FMLA form is submitted—regardless of whether the employee submits it voluntarily or at the request of the employer—there is an inquiry by the employer under § 12112(d). If that view is correct, what does a district court do in a case—much like in *Cash* and possibly here—where the employee voluntarily discloses a medical condition to a colleague at work, that colleague then shares the information with others, and the employee subsequently submits a request for leave by turning in an FMLA form? Should the district court conclude that an inquiry occurred as a matter of law and that

4      JORDAN, J., Concurring in Part & Dissenting in Part  22-12354

the employer failed to maintain the confidentiality of the medical condition? Such a conclusion, in my view, is difficult to square with our decision in *Cash*, 231 F.3d at 1307–08.

I would set aside the district court's summary judgment in favor of the Department as to the § 12112(d)(4) inquiry claim and have a jury decide, among other things, whether the Department initiated an inquiry.